CALIFORNIA PROLIFE COUNCIL
POLITICAL ACTION COM-
MITTEE, Plaintiff,

v.

Jan SCULLY, et al., Defendants and
Defendants in Intervention.

And Consolidated Actions.

No. CIV. S–96–1965LKK/DAD.

United States District Court,
E.D. California.

Jan. 6, 1998.

George Waters, Olson, Hagel, Leidigh, Waters & Fishburn, Sacramento, CA, for plaintiff California Democratic Party.

John E. Mueller, Nielsen, Merksamer, Parrinello, Mueller & Naylor, Mill Valley, CA, for plaintiffs California Republican Party, Schroeder, Swartz, Wolin, Steel & Leonard.

Joseph Remcho, Remcho, Johansen & Purcell, San Francisco, CA, for the Union plaintiffs.

Thomas Kevin Hockel, Walnut Creek, CA, for plaintiff California Prolife Council Political Action Comm.

James Bopp, Jr., John K. Abegg, Bopp, Coleson & Bostrom, Terre Haute, IN, for plaintiff California Prolife Council Political Action Comm.

James V. Lacy, Lacy and Lacy, Laguna Niguel, CA, for plaintiffs Hoffenblum & Levine.

Lawrence Thomas Woodlock & Deborah Allison, Fair Political Practices Comm'n, Sacramento, CA, for defendant Fair Political Practices Commission.

Bradley S. Phillips, Steven Weisburd, Munger, Tolles & Olson, Los Angeles, CA, for Intervenors Miller & Holton.

Deborah Goldberg, Brennan Center for Justice, New York, NY, for Intervenors Miller & Holton.

## OPINION[1]

KARLTON, Chief Judge Emeritus.

A healthy scepticism on the part of the governed concerning those who govern is as much a mark of a vibrant democracy as a paranoid suspicion is a symptom of its decline. Whether California's voters entertain the former or suffer the latter is of some moment in the matter at bar. After a two-week trial the issue remains one upon which reasonable minds might disagree.[2] That some elected officials have subordinated the duties of their office to their personal greed and ambition is hardly news or new. It is also true, however, that many seek office to advance their political convictions, and if elected, discharge the duties of their office pursuant to their view of the public good, as that view is informed by their ideology.[3] This case tests whether the evident disaffection from the prior political regimen of campaign financing exhibited by California's voters in adopting Proposition 208 is premised upon a proper concern or rests upon an

---

1. The court has made Findings of Fact concerning any factual issue that any party thought potentially relevant to disposition of the case. Because they consist of some 456 findings, they have been set out in a separate document issued concurrently with this opinion. They may also be found at the court's website which is located at www.caed.uscourts.gov. Particular findings will be referred to as appropriate during the course of this opinion.

2. As to the issue of a legitimate government interest, the court made eighteen specific findings. Perhaps the most crucial is Finding No. 61 which reads: "Between 1990 and 1994, five members of the State legislature were convicted and sentenced to prison in this court on felony racketeering, extortion, bribery and money laundering charges. These convictions involved the corrupt exchange of money. As to certain defendants, the money was delivered in the form of campaign contributions. As to others, they were or were proposed to be delivered for the recipient's personal use."

3. As noted, after an intensive investigation extending over four years, the federal government successfully prosecuted some five elected members of the California legislature which consists of eighty Assembly members elected every two years and forty Senate members elected every four years. Whether the conviction of these five is viewed as a cause for despair as to the moral character of those we elect, or an occasion to celebrate the apparent rectitude of the vast majority, may turn more on the temperament of those that consider the question than on some objective standard.

exaggerated view, and whether in either event, the various provisions of the initiative abridge those constitutional rights which are central to preservation of the democratic process.[4]

Proposition 208 is an initiative adopted by California's voters. Its some fifty sections adding to and amending the California Government Code[5] seek to regulate, *inter alia,* who may contribute to political campaigns, how much may be contributed, when contributions can be made, what purposes the contributions may be put to, the contents of various political advertisements and, indirectly, the extent of expenditures. Essentially the instant suit challenges each substantive provision asserting that it violates the strictures of the First Amendment to the United States Constitution.[6] It is brought by a political action committee ("PAC") representing those who seek to limit abortions, various labor unions and their PACs, individual contributors to political campaigns, candidates and prospective candidates, officeholders, the Republican and Democratic parties, and two professional slate mailers. The initiative is defended by California's Fair Political Prac-

tices Commission ("FPPC"), the state agency responsible for its administration, and its official proponents, who were permitted to intervene.[7]

Before addressing the substantive provisions of Proposition 208, the court must first consider whether it should resolve this facial challenge to a state statute which has not been authoritatively construed by the state courts.

# I.

## FEDERAL COURTS AND STATE STATUTES

Plaintiffs' decision to challenge in a federal forum a California statute that has not yet been authoritatively construed by the California Supreme Court raises questions about a federal court's role in such circumstances. Below, I first examine whether this court should reach the merits of the litigation.

### A. *Abstention, Certification or Resolution on the Merits*

The Constitution of the United States provides for a federal judiciary. Its jurisdiction

---

4. This court has previously explored the relationship between the right of the States to regulate their internal affairs, including elections, and the mandates of the First Amendment. *See Service Employees International Union v. Fair Political Practices Comm'n,* 747 F.Supp. 580, 583 (E.D.Cal.1990) (*"SEIU II"*). Reiteration here would serve no useful purpose. Suffice it to say that the Bill of Rights confines the power of the States to regulate matters within the purview of the First Amendment. *Id.* This is so whether the regulation derives from the legislature, *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 217, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986), or the initiative process. *Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290, 295, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981).

5. Unless otherwise indicated, all statutory references are to the California Government Code.

6. The First Amendment by its literal terms protects both speech and political association. Because the actual provisions of the First Amendment are almost never alluded to in the jurisprudence addressing limits on campaign financing, it may be worthwhile to recall that its provisions forbid any limitation on speech or political association. "Congress shall make no law ... abridging the freedom of speech ... or the right of the people to peaceably assemble,

and to petition the Government for a redress of grievances." U.S. Const.Amend. I. It was made applicable to the States by virtue of the Fourteenth Amendment. *Stromberg v. People of State of California,* 283 U.S. 359, 368, 51 S.Ct. 532, 75 L.Ed. 1117 (1931). From the uncompromising terms of the Amendment it would seem that devising any test upholding limits on political speech or association would be a difficult task indeed, requiring, if permitted at all, the most delicate of judgments, predicated on the most persuasive evidence of the need to serve not only legitimate but urgent governmental interests. This opinion explores, among other issues, what standard the Supreme Court has made applicable to restrictions on speech and political association despite the language of the First Amendment, and whether the requisite showing has been made in the case of Proposition 208.

7. The initial parties to the suit stipulated to permit the official proponents of the initiative, Ruth Holton and Tony Miller, to intervene on behalf of the defendant. Thereafter, the plaintiffs, believing that an intervening decision justified the motion, *see Arizonans for Official English v. Arizona,* —— U.S. ——, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997), moved for reconsideration of the order granting intervention. The court declined to do so. *See* Order filed July 9, 1997.

extends to "all cases, in law and equity, arising under this constitution and the laws of the United States." U.S. Const., Art. III.

▪▪▪ Given the constitutional source of the federal courts' jurisdiction over cases arising under the fundamental document, it is hardly surprising that in federal question cases "federal courts have a 'virtually unflagging obligation ... to exercise the jurisdiction given them.'" *England v. Louisiana Bd. of Medical Examiners*, 375 U.S. 411, 415, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964). Nevertheless, where the resolution of a federal question case turns on the meaning of a state's statute, the Supreme Court has suggested a more cautious approach. It has been said that federal courts "normally ... ought not to consider the constitutionality of a state statute in the absence of a controlling interpretation of its meaning and effect by the state court." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 117 S.Ct. 1055, 1074, 137 L.Ed.2d 170 (1997).[8]

▪▪▪ *Arizonans'* counsel of restraint appears premised, at least in part, upon the fact that a federal court, while it may speak decisively about federal law, lacks authority to definitively interpret a state statute. *Id.* at ——, 1073–74 (holding that federal courts lack competence to rule definitively on the meaning of state legislation); *Moore v. Sims*, 442 U.S. 415, 429, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979) (state courts "are the principal expositors of state law"). The High Court has also opined that resort to the state courts serves to avoid "friction generating error" which a federal court risks when it "endeavors to construe a novel state act not yet reviewed by the State's highest court." *Arizonans*, 520 U.S. at ——, 117 S.Ct. at 1074.[9] As I now explain, however, it is not always desirable or even feasible to decline resolution of a claim under the federal constitution because it implicates construction of a state statute which has not been reviewed by the state's highest court.

▪▪▪ A federal court asked to determine the constitutionality of a state statute not yet considered by the state court has at least three options. First, the court may abstain under the principles first enunciated in *Railroad Commission of Tex. v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Second, in many states a federal court has the option of certification directly to the highest court of the state. Finally, the court may proceed to the merits of the constitutional question notwithstanding the absence of an authoritative state court construction. Below I consider each option in the matter at bar.

▪▪▪ *Pullman* abstention derives from the general rule that constitutional issues should be avoided where a case can be disposed of on non-constitutional grounds.[12]

**8.** The source for the authority to exercise the restraint alluded to in *Arizonans* is less than pellucid. Because there is no provision in the Constitution nor in any statute which authorizes abstention, it is clearly a doctrine of federal common law. Congress, however, in 28 U.S.C. § 1331 provided the district courts with federal question jurisdiction, and it is a commonplace of federal practice that federal common law doctrines must give way to statutory commands. *See, e.g., Middlesex County Sewerage Authority v. Nat'l Sea Clammers Assn.*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). Nor is it any answer that abstention is not a surrender of federal jurisdiction but simply a postponement. Given the cost of litigation in multiple fora, doctrines of collateral estoppel and the like, abstention frequently, if not inevitably, is the equivalent of a refusal to adjudicate.

**9.** At least one commentator has queried whether a federal court's decision invalidating a state statute on constitutional grounds causes any more friction than an identical state court deci-

sion. James C. Rhenquist, *Taking Comity Seriously*, 46 Stan. L.Rev. 1049, 1072 (1994). He suggests that "the game is worth the candle only if the state court can invalidate the state policy on state law grounds." *Id.* at 1073. Put directly, if the source of invalidation is the federal Constitution, it is that fact which is friction generating rather than whether the determination is made by a state or federal court.

**12.** *Pullman* abstention may be raised by the parties or the court *sua sponte* at any time. *See Bellotti*, 428 U.S. 132, 144 n. 10, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976)("it would appear that abstention may be raised by the court *sua sponte* "). Here, the court raised the issue of abstention *sua sponte* after trial had begun and all the parties were united in their opposition to abstention. Given the fact that the FPPC is a party in this action and is the authoritative voice of the State of California concerning questions relating to Proposition 208, it may be said that the State has opposed abstention in this case.

The Court observed that a federal court's resolution of a state law issue could not "escape being a forecast rather than a determination" because the "last word" on the construction of the state statute belonged to the state's highest court. *Pullman,* 312 U.S. at 499–500. Thus, where state court construction may avoid resolution on constitutional grounds, *Pullman* suggests that a federal court may direct the plaintiff to bring a state court action on the state law question.[13] *But see Lehman Brothers v. Schein,* 416 U.S. 386, 390, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974) ("mere difficulty in ascertaining local law is no excuse for remitting the parties to a state tribunal for the start of another lawsuit").

■ The High Court has made clear, however, that abstention is not warranted in every instance in which the state court has not passed on a particular state law question. *See Wisconsin v. Constantineau,* 400 U.S. 433, 439, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) ("where there is no ambiguity in the state statute, the federal court should not abstain but should proceed to decide the federal constitutional claim"); *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984) ("federal courts need not abstain ... when a state statute is not 'fairly subject to an interpretation which will render unnecessary adjudication of the federal constitutional question' "). Especially, where, as here, a statute is alleged to abridge free expression, federal courts have been reluctant to accept the delay attendant upon initiation and resolution of state court proceedings. *See Houston v. Hill,* 482 U.S. 451, 467, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (observing that "we have been particularly reluctant to abstain in cases involving facial challenges based on the First Amendment"); *see also Dombrowski v. Pfister,* 380 U.S. 479, 489–92, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) (abstention not appropriate where statute was challenged as abridging First Amendment activities).[14]

■ The problem tendered here is similar to that considered in *Bates v. Jones,* 904 F.Supp. 1080, 1087 (N.D.Cal.1995). There, the intervenors moved for abstention, noting the existence of a pending state court case. The district court denied the motion. It first concluded that there was no reasonable chance that a California court would invalidate the enactment on state constitutional grounds. Moreover, given that the state opposed abstention, the court concluded that the interest in avoiding friction with state policies was not implicated. Finally, it concluded that proceeding to the merits was consistent with the state's interest because the delay resulting from abstention would impair state functions by causing chaos in the upcoming election. Many of the same considerations exist in the case at bar.

■ As noted above, the State through the FPPC, opposed abstention, and thus the interest in avoiding friction is not implicated here. Accordingly, "[t]he pivotal question ... is whether the statute is 'fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question.' " *Houston,* 482 U.S. at 468. Here, as in any case, there is always some possibility that the state's highest court might impose a limiting construction on one or more of the challenged provisions. Nonetheless, as I explain *infra,* the success of plaintiffs' multi-faceted attack on Proposition 208 turns in large measure on the validity of the contributions limitations scheme, since most other provisions are justified by reference to those limitations. No party has proposed a limiting construction on these key provisions that would substantially alter or avoid the constitutional question.[15] Accord-

---

13. After filing suit in the state court, the parties can thereafter elect to pursue both the state law claims and the federal constitutional challenge in state court, or, may litigate only the state issue in state court reserving the right to return to federal court on the constitutional issue. *See England v. Louisiana Medical Examiners,* 375 U.S. 411, 417–18, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).

14. The doctrine of special urgency for First Amendment questions has never been directly questioned by the present Supreme Court. Although some may think that *Arizonans* is an opening to reconsideration, such speculation is for the authors of law review articles and not district judges bound by the expressed holdings of the High Court.

15. As I describe *infra,* the broad powers of the California Supreme Court to rewrite statutes suggests that the possibility of a saving revision may

ingly, it appears to this court that the hope of avoiding constitutional adjudication by virtue of state construction must give way to the reluctance to delay resolution of First Amendment questions, particularly in light of the self-censorship Proposition 208 has already generated.[16] Moreover, at this stage in the proceedings, after extensive and detailed briefing, a long and arduous trial, and two days of argument, the duplication of effort and expense, and the delay attendant on resorting to the state court weighs heavily against abstention. Given all the above, the court believes that *Pullman* abstention is inappropriate.[17]

*Arizonans for Official English* involved construction of a statute of a state where certification to its highest court was available. Despite the request of the state, both the trial court and the Ninth Circuit declined to certify questions to the state court. The Supreme Court explained that certification procedures "do not entail the delays, expense and procedural complexity that generally attend abstention decisions." *Arizonans,* 520 U.S. at ——, 117 S.Ct. at 1075. The critical factor in determining whether certification is appropriate is the existence of "novel, unsettled questions of state law." *Id.* at ——, 117 S.Ct. at 1074. Unfortunately, however, certification is not available to this court.

Until November of this year, California had no procedure permitting certification to its Supreme Court. On November 15, 1997, that court adopted California Supreme Court Rule 29.5 which permits the U.S. Circuit Court of Appeals to certify questions of California law to the state Supreme Court. Unfortunately, that opportunity has not been extended to the district court.

Because abstention is inappropriate and certification is unavailable, this court has no other choice but to address the merits of the constitutional challenge.

## B. *Statutory Construction*

Having determined that the court should address the merits of plaintiffs' claim, the court must next consider how to determine what the Proposition means. The first step in that process is to determine whether a federal court applies state or federal rules of statutory construction in making an initial determination about what each provision of the statute means.[18]

■ When a federal court resolves state law issues pursuant to the exercise of its diversity jurisdiction, it is said that the federal court applies state law, and is "in effect, sitting as a state court." *Commissioner of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). The instant case tenders questions about the appropriate function of a federal district court in construing a state statute while exercising its federal question jurisdiction. Happily, resolution of this question is unnecessary in the instant matter. The general rules of statutory construction are ap-

be less remote than the text of the proposition suggests. That fact does not support abstention, however, since any such reformation is itself dependant upon a finding concerning the constitutionality of the provisions of the initiative.

**16.** The court has made dozens of specific findings concerning how plaintiffs have altered their contribution patterns and election strategy in response to Proposition 208. In addition, the court concluded: "Proposition 208 has created an atmosphere of uncertainty in which some plaintiffs have limited and censored their speech and associational activity out of fear of prosecution and a desire to conform to the law, and are likely to do so in the future. Although the uncertainty will diminish over time, there will always be some uncertainty and confusion. In any event, some plaintiffs will be adversely effected by self-censorship generated by Proposition 208 for a number of elections." *See* Finding No. 69.

**17.** Although the court will not delay resolution of the central federal question tendered by this litigation, as it explains *infra,* the fact that plaintiffs here seek injunctive relief provides a means of addressing both this court's responsibility relative to questions of the applicability of the federal Constitution to state statutes, and the state court's final authority as to the meaning of state statutes.

**18.** The question of whether a federal court applies state rules of statutory construction is, of course, distinct from the question of whether a federal court applies state law rules to determine whether an unconstitutional provision can be severed from the remainder of the Act, or from the question of whether the federal court applies state law in determining if an otherwise unconstitutional provision is susceptible of a limiting construction.

parently identical under federal and California law. *See, e.g., Lillebo v. Davis,* 222 Cal. App.3d 1421, 1440, 272 Cal.Rptr. 638 (1990). Because the question is, at best, simply of academic interest, it need not be resolved.[19]

## II.

## ASSERTED DISCRIMINATION AGAINST CHALLENGERS

■ The court has determined on the basis of the evidence before it that, as a fact of life, ordinarily incumbents have a significant advantage over their challengers.[20] Nonetheless, plaintiffs contend that the interplay among various provisions of Proposition 208 discriminate against candidates who are not famous, wealthy, incumbents or otherwise advantaged.

■ Proposition 208 applies the same limitations to all candidates. The Supreme Court has said in the context of campaign reform legislation that "[a]bsent record evidence of invidious discrimination against challengers as a class, a court should generally be hesitant to invalidate legislation which on its face imposes evenhanded restrictions." *Buckley v. Valeo,* 424 U.S. 1, 31, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).[21] The commanded hesitancy, and the absence of evidence of the invidious discrimination that *Buckley* also demands, defeats plaintiffs' claim of discriminatory impact.

■ As intervenors contend, under *Buckley,* the discrimination must both be against the class of challengers, and must "invariably and invidiously benefit incumbents as a class." *Id.* at 33. The evidence does suggest that any contribution limitation coupled with a limitation on the time when contributions may be received will exacerbate the disadvantage of challengers for competitive seats who are not either independently wealthy and willing to expend their own funds on their campaign, or who have not achieved name recognition gained in previous campaigns or in other fields of endeavor. Nonetheless, such challengers are so disadvantaged to begin with that the adverse effects of Proposition 208 may reasonably be viewed as a *de minimus* problem. Moreover, the need to qualify and continually refine the definition of the class adversely effected demonstrates that the statute does not discriminate against all challengers as a class.

Plaintiffs' reliance on this court's decision in *SEIU II,* and the Ninth Circuit's affirmance thereof, *SEIU v. FPPC,* 955 F.2d 1312, 1322 (9th Cir.), *cert. denied,* 505 U.S. 1230, 112 S.Ct. 3056, 120 L.Ed.2d 922 (1992), to support their contention is misplaced. There, the issue was whether regulating campaign contributions on a fiscal year basis favored incumbents. Because this court found that essentially only incumbents raised money in the off year, measuring contribution limitations on a fiscal year basis invariably and invidiously "discriminate[s] against challengers as a class." *SEIU,* 955 F.2d at 1318. This class-wide discrimination was sufficient to undermine the challenged provision, particularly given that the defenders of Proposition 73 failed to advance any reason why measuring contribution limits on a fiscal basis advanced the state's interest in preventing corruption or the appearance of corruption. *SEIU,* 955 F.2d at 1321; *SEIU,* 747 F.Supp. at 589.

Because the court concludes that the evidence is insufficient to find that Proposition 208 inevitably discriminates against challengers as a class, the court determines that the

---

**19.** *See Goldman v. Salisbury,* 70 F.3d 1028, 1029 (9th Cir.1995) (federal courts interpreting state statutes are "bound by California rules of construction"); *see also Municipal Utilities Bd. of Albertville v. Alabama Power Co.,* 21 F.3d 384, 387 (11th Cir.1994) ("[w]hen construing a state statute, we look to state rules of statutory construction, because the same rules of construction apply in a federal court as would apply in a state court.")

**20.** The court has made some 38 findings of fact concerning the asserted discriminatory effect of Proposition 208. *See* Findings Nos. 298 through 336. Many of the findings reflect the advantage that incumbents enjoy over challengers.

**21.** While this holding carries more than a whiff of Anatol France's famous dictum that the law in all its majesty forbids both the rich and poor from sleeping under the bridges of Paris, that observation has apparently not been found persuasive by the High Court.

plaintiffs' first basis for attack upon Proposition 208 must fail.

## III.

## CONTRIBUTION LIMITS

Both sides agree that the provisions of Proposition 208 limiting contributions are the linchpin of the statute and, if these provisions fail to meet constitutional muster, the statute's whole scheme is in doubt. Given the agreed centrality of the provisions limiting contributions, I turn to them first.

### A. *The Provisions*

The initiative presents a complex, reticulated set of provisions, which curtail the "free market" in political contributions which preceded its adoption.[22] It was described at trial by its proponents as a system of "variable contribution limits."

The initiative limits what may be contributed to candidates, to parties, and to PACs. The statute prohibits any person, broadly defined to include virtually any entity other than a political party and a small contributor committee (as defined by the statute),[23] from contributing more than $100 per election in small local districts (less than 100,000 residents), $250 per election for Senate, Assembly, Board of Equalization and large local districts, and $500 per election for statewide office. Section 85301(a)-(c). These limits are increased to $250, $500 and $1,000, re-

spectively, for candidates who agree to specified expenditure limits. Section 85402. The Act also limits contributions to PACs to $500 per year, section 85301(d), and contributions to political parties to $5,000 per year. Section 85303. The Act further places a $25,000 aggregate limit on the amount any person (broadly defined) may contribute to all candidates and political parties combined in any two-year period. Section 85310.

Proposition 208 also limits the amounts campaigns may receive in the aggregate from PACs, corporations, unions, and other non-individuals, other than small contributor committees and political party committees, to 25% of the so-called voluntary expenditure limit for that office. Section 85309. Candidates are also limited to receiving a cumulative total of 25% of the expenditure limit from all political party committees. Section 85304. Finally, the Act bans transfers between candidates, Section 85306, and bans all contributions from lobbyists. Section 85704.[24]

### B. *Standard of Review Applicable to Contributions*

In order to challenge a statute on First Amendment grounds, plaintiffs must first demonstrate that the statute impinges on rights protected by the First Amendment. *See SEIU v. FPPC*, 721 F.Supp. 1172, 1175 (E.D.Cal.1989) ("SEIU I"). It is established that "contribution and

---

22. Professor John Lott of the University of Chicago Law School described the questions tendered to the court in terms of a market analysis. While the court is not satisfied that an analysis premised upon the distinction between a free market and a controlled economy is a perfect fit, it does appear to the court that it is not inappropriate to recognize that an unregulated system of political contributions has some of the qualities of a free market economy.

23. "Person" is defined in Cal. Gov't Code § 82047 as "an individual, proprietorship, firm, partnership, joint venture, syndicate, business trust, company, corporation, limited liability company, association, committee, and any other organization or group of persons acting in concert."

The statute defines a small contributor committee as: "[A]ny committee which meets all of the following criteria:

(a) It has a membership of at least 100 individuals.
(b) All the contributions it receives from any person in a calendar year total fifty dollars ($50) or less.
(c) It has been in existence at least six months.
(d) It is not a candidate-controlled committee."
Cal. Gov't Code § 85203.

24. The provisions relating to contributions from lobbyists are actually broader and more onerous. The Act provides "no elected officeholder, candidate or the candidate's controlled committee may solicit or accept a campaign contribution or contribution to an officeholder account from, through, or arranged by a registered state or local lobbyist if that lobbyist finances, engages, or is authorized to engage in lobbying the governmental agency for which the candidate is seeking election or the governmental agency of the officeholder." Cal. Gov't Code § 85704.

expenditure limitations operate in an area of the most fundamental First Amendment activities." *Buckley*, 424 U.S. at 14. Independent expenditures are protected by the First Amendment because "spending money on one's own speech must be permitted." *Colorado Republican*, 518 U.S. 604, ——, 116 S.Ct. 2309, 2321, 135 L.Ed.2d 795 (1996) (Kennedy, J., *concurring*). Under *Buckley*, limits on independent expenditures cannot be justified by reference to the state's compelling interest in deterring fraud or the appearance of fraud since such expenditures do not "pose dangers of real or apparent corruption comparable to those identified with large campaign contributions." *Buckley*, 424 U.S. at 46.

On the other hand, viewing the question solely from the contributor's point of view, *Buckley* held that contribution limits "involve little direct restraint" on political communication. *Buckley*, 424 U.S. at 21.[25] The court explained, however, that contribution limits "also impinge on protected associational freedoms." *Id.* at 22;[26] *see also Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 299, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981) ("[a] limit on contributions ... need not be analyzed exclusively in terms of the right of association or the right of expression. The two rights overlap and blend; to limit the right of association places an impermissible restraint on the right of expression"). Nonetheless, " '[e]ven a "significant interference" with protected rights of political association' may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *Buckley*, 424 U.S. at 25; *see also*

*Service Employees Int'l Union v. FPPC*, 955 F.2d 1312, 1322 (9th Cir.), *cert. denied*, 505 U.S. 1230, 112 S.Ct. 3057, 120 L.Ed.2d 922 (1992) ("contribution limits are subject to a 'less stringent test than strict scrutiny' "); *see also Federal Election Comm'n v. Massachusetts Citizens for Life*, 479 U.S. 238, 261–62, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) ("the Government enjoys greater latitude in limiting contributions than in regulating independent expenditures"). Thus, burdens on contributions "may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *Id.* at 25.

■ While the statute must be closely drawn "to avoid unnecessary abridgement of associational freedoms," the force of that requirement is muted. Thus, as a general matter, the court will not second guess a legislative determination as to where the line for contribution limits should be drawn. " '[I]f it is satisfied that some limit on contributions is necessary, a court has no scalpel to probe, whether, say a $2,000 ceiling might not serve as well as a $1,000.' (citation omitted). Such distinctions in degree become significant only when they can be said to amount to differences in kind." *Buckley*, 424 U.S. at 30.[27]

Plaintiffs attack Proposition 208's contribution limits on three bases. First, they contend that here the record evidence is insufficient to justify a finding of corruption or the appearance of corruption so as to justify the limitations on speech and associational rights imposed by Proposition 208's contribution

25. There are at least four separate First Amendment interests which would appear to be cognizable in suits such as this: the interests of contributors in associating with the political views of the candidate; the interest of the candidate in expressing those views; the interest of the members of the public that desire to hear the candidates views; and the interest of the members of the public who desire not to hear the candidate's views. Because the last group has a direct way of protecting itself from meaningful exposure without adversely effecting the rights of the first three groups, it would seem that the right of that group to be left alone is not as weighty.

26. After holding that the speech value of contributions was limited to the symbolic expression of support for a candidate, the *Buckley* court held that "the primary First Amendment problem raised by the Act's contribution limits is their restriction on one aspect of the contributor's freedom of political association." *Buckley*, 424 U.S. at 24.

27. The court did not seek to explain how this modest approach conformed to its oft expressed view that "[p]recision of regulation must be the touchstone" of legislation trenching upon First Amendment concerns. *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

limits. Second, they contend that the limits on contributions by individuals and PACs are not narrowly drawn to the state's interest in preventing corruption or the appearance of corruption, citing, *inter alia*, the fact the contribution limits double when a candidate accepts the Act's spending limits. Third, plaintiffs contend that the contribution limits at issue burden not only the First Amendment rights of the contributor but also the First Amendment rights of the candidates, since the limits are so low that they prevent the candidate from amassing the resources necessary for effective advocacy. I turn first to the question of legitimate governmental interest.

## C. *Legitimate Governmental Interests*

■ It is uncontested that the interest in preventing corruption and the appearance of corruption is a legitimate state interest. *See Federal Election Comm'n v. Nat'l Conservative Political Action Committee*, 470 U.S. 480, 496–97, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) ("NCPAC"). In 1972, when considering California's initial attempt to limit political contributions, this court noted that the "anti-corruption in fact and appearance rationale [was] the only [legitimate governmental interest] sanctioned by the Supreme Court in defense of political contributions and expenditure limitations." *SEIU I*, 721 F.Supp. at 1175 (E.D.Cal.1989). I noted the following year, however, that the court had identified an additional interest, namely, "limiting 'the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas.' " *SEIU II*, 747 F.Supp. at 584 (quoting *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 660, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990)). From all that appears, there has been no additional interest identified by the Supreme Court as sufficient to justify such limitations. I thus turn to the evidence concerning corruption and its appearance.

The High Court has explained that "[c]orruption is a subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns." *NCPAC*, 470 U.S. at 497("the hallmark of corruption is the financial *quid pro quo*: dollars for political favors.")

■ This court observed in the past that "the boundaries of the notion of the appearance of corruption have not been fully developed." *SEIU I*, 721 F.Supp. at 1179. Unfortunately, little has happened since then to help clarify the notion. Whatever else is true, the appearance of corruption must be more than illusory or conjectural; instead "there must be real substance to the fear of corruption; mere suspicion, that is, 'a tendency to demonstrate distrust ... is not sufficient,' no matter how widely the suspicion is shared." *Id.* (quoting *NCPAC*, 470 U.S. at 499).

■ Above, I noted the conviction of a number of members of the California legislature essentially for bribery in office. In addition, the government's investigation alluded to there resulted in the conviction of a legislatively appointed member of an administrative agency, several members of the staff of the state legislature, and a number of lobbyists. Whether the problem of corruption is viewed as wide-spread and endemic or rare and case-particular, appears beside the point. These violations of law indicate that the problem of corruption in the legislative process is not illusory.

While there is evidence of a basis for concern relative to the legislative process, the court notes that there is no record evidence concerning corruption in the conduct of the elected members of the judicial or executive branches of the state government.[28] Nonetheless, the voters' adoption of Proposition 208 appears to demonstrate suspicion of the political process as a whole, and not simply

---

**28.** That is not the same as saying that there might not be a basis for concern. Newspapers have reported events which might be perceived as raising questions about the fund raising conduct of the state's Insurance Commissioner and Attorney General. As noted, however, those events were not addressed in evidence before this court, and thus the court cannot determine whether there is any substance to those reports.

the legislative branch. Indeed, the persistence of the California electorate in seeking to enact contribution limits appears to demonstrate a wide-spread sense of voting Californians that there is at least an appearance of corruption which must be addressed.[29] This judgment, coupled with the huge expenditures requiring large contributions which have become the hallmark of California politics,[30] both demonstrate that there is an interest sufficient to justify regulation. Under the circumstances, the court concludes that there is a legitimate governmental interest served by limitations on campaign contributions.

### D. Variable Limits

■ Once the court concludes that a legitimate governmental interest is served by contribution limits, the court must ordinarily defer to the judgment of the enacting body as to where to set those limits. *Buckley,* 424 U.S. at 30; *and see Federal Election Comm'n v. Nat'l Right to Work Committee,* 459 U.S. 197, 210, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982). Plaintiffs nonetheless maintain that the provisions doubling contribution limits for those candidates accepting expenditure limits demonstrate that the lower limits cannot have been viewed by the electorate as addressing either corruption or the appearance of corruption.

Given the substantial deference the court is obligated to accord the judgments of the electorate concerning the level of contribution limitations, it is important to understand the underlying premise of the argument. The argument is not that the court should choose between, for instance, $100 and $200 as the appropriate level, but that the electorate has manifested its conclusion that a $200

contribution limitation is not inherently corrupting. Put another way, plaintiffs' contention essentially is that since the electorate permitted a doubled contribution upon agreement to expenditure limitations, it must follow that those limitations are perceived to be sufficient to address the issue of corruption or the appearance of corruption. Given this premise, the argument continues, since the lower limits do not serve the purpose of addressing corruption or the appearance of corruption, and since those are the only legitimate governmental purposes which contribution limits may serve, the lower limits must be stricken. As with so many of the arguments tendered by both sides in this case, this argument is not without persuasive force. Nonetheless, the court cannot accept it.

It is true, as plaintiffs maintain, that whatever expenditure limit a candidate agrees to, that agreement is unrelated to the corrupting effect of any particular level of campaign contribution.[31] It does not follow, however, as plaintiffs contend, that since the corrupting effect of a $200 contribution is the same whatever the ultimate amount which must be raised may be, the lower expenditure limits applicable to those who do not accept expenditure limits cannot be viewed as addressing either actual corruption or its appearance.

Defendants argue that the lower variable contribution limitation is directed towards the evils of corruption and the appearance of corruption. While acknowledging that the potential corruption attendant upon the higher limit is tolerated because permitting such potential corruption also serves other legitimate goals, they nonetheless contend that the variable limit does not demonstrate that the lower limits do not address corruption. I must agree. It is not unreasonable for the

---

**29.** The court must acknowledge that it may not be justified in inferring that the voters' adoption of restrictions on the financing of executive and judicial elections reflects their conclusion that contributions to those campaigns are suspect. Given that the voters adopted term limits and open primaries as well as Proposition 208, the adoption of the latter may be no more than a manifestation of the voters' general disaffection from government, rather than a particular judgment concerning the financing of executive and judicial branch elections.

**30.** Among the many findings made by the court concerning the amount expended in California elections the court noted that: "In her campaign for Governor, Dianne Feinstein spent $19 million." *See* Finding No. 93.

**31.** The court has found: "For purposes of determining whether a particular level of contribution creates the appearance or reality of corruption, a candidate who has accepted expenditure ceilings is no different from any other candidate." *See* Finding No. 268.

people to have concluded that voluntary expenditure limits, by reducing the overall amount the candidate must raise, reduce the number of contributors with a corrupt intent from whom a candidate must seek contributions. Thus, relating the amount one may receive to accepting voluntary expenditure limits may be viewed as serving the recognized purpose of addressing the potential for corruption inherent in any system of private campaign fundraising. In sum, while it may be that voluntary expenditure limits do not alter the potentially corrupting effect of a $200 contribution, it is not unreasonable to believe that the limits reduce the likelihood that a candidate will accept a corrupting contribution.

The conclusion that the lower limits do address corruption, however, does not end the analysis. Rather, contribution limits the level of which vary dependant upon accepting expenditure limits, raise the question of whether Proposition 208's lower campaign limits are closely drawn.

■ While it is true that *Buckley* did not impose a least restrictive means test for the regulation of campaign contributions, it nonetheless required that the means chosen be closely drawn. A statute is closely drawn when the means chosen do not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward v. Rock Against Racism,* 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *and see SEIU v. FPPC,* 955 F.2d 1312, 1322 (9th Cir.), *cert. denied,* 505 U.S.

1230, 112 S.Ct. 3056, 120 L.Ed.2d 922 (1992)(holding that in order for the means adopted to be "closely drawn" a provision must "avoid unnecessary abridgment of associational freedoms").

■ Whatever else may be true of Proposition 208's variable limits scheme, it seems relatively clear that the electorate has manifested its judgment that the higher limitations are not unacceptably corrupting, and suffice so long as they are related to a constitutionally noncognizable value, namely limitations on expenditures.[32] It follows that the lower limits are not closely drawn to achieve the only governmental purposes sufficient to justify regulation.[33] Put another way, the adoption of the variable limits reflects a conclusion on the part of the voters that the $200 limit suffices to address the issue of corruption even if it is not the lowest amount which would do so.[34] That conclusion requires a finding that the lower limit is not closely drawn. Because campaign contributions translate into a candidate's speech, and are protected as associational rights, they may not be restricted to a degree unnecessary to achieve the governmental purpose. The determination that under specified but constitutionally noncognizable conditions, $200 suffices, requires that the lower limits be stricken. I thus conclude that the lower limits are not narrowly drawn to achieve a legitimate governmental purpose, and thus the provisions for those lower campaign limitations are constitutionally infirm.[35] As the

**32.** The variable limits established by proposition 208 must be distinguished from statutes which establish expenditure limits as a condition of public financing. Because public financing is inherently free from corruption, expenditure limits are a necessary concomitant to insure that unlimited expenditures do not reintroduce the potentially corrupting effect of private fund raising.

**33.** The ballot measure arguments in support of Proposition 208 assured the voters, *inter alia,* that "Proposition 208 provides a comprehensive solution to corrupting special interest influence in California." Dfts' Exhibit B, Ballot Rebuttal to Argument Against Proposition 208. Whatever limitation exists on judicial review of the voters' understanding of the contents of initiatives, *see Bates v. Jones,* 131 F.3d. 843 (9th Cir.1997), it is, to say the least, incongruous for defendants to

contend that the voters in adopting Proposition 208, were agreeing to perpetuate a level of corruption.

**34.** Indeed, the voters may well have concluded that there is no amount so low that it will not tempt someone. In any event, they apparently concluded that in effect, a $200 limit works as well as a $100 limit. As this court found: "There is no evidence that the particular contribution limits set by Proposition 208 will have any effect on either actual corruption or the appearance of corruption." *See* Finding No. 75.

**35.** Plaintiffs also contend that the variable limits unconstitutionally require candidates to surrender a right protected by the First Amendment, their right of unrestricted speech, in return for a governmental benefit, the opportunity to raise funds at a higher level. *See, e.g., Perry v. Sinder-*

court now explains, Proposition 208 suffers from yet another constitutional infirmity.

### E. *Insufficient Assets*

The third basis for plaintiffs' attack is that the statute sets contribution limits at such a low level that candidates will not be able to marshal sufficient assets to campaign effectively. Plaintiffs argue that, especially when viewed in light of the expenditure limits, which they contend most candidates will feel compelled to accept, the effect of Proposition 208 is to restrain political speech in violation of the First Amendment.[36]

■ Plaintiffs have tendered a wealth of factual and opinion evidence in support of their position. The court has found myriad facts which, taken together, require the court to conclude that on the record made at trial the effect of the initiative is not only to significantly reduce a California candidate's ability to deliver his or her message, but in fact to make it impossible for the ordinary candidate to mount an effective campaign for office.[37]

Although defendants tendered some opinion evidence that the contribution levels were sufficient to permit an adequate campaign, on the whole they did not present evidence directly contradicting plaintiffs' factual contentions. Defendants note, however, that the limits in Proposition 208 are comparable to those at stake in *Buckley* and thus suggest that plaintiffs are precluded from successfully arguing that the levels are insufficient to sustain a meaningful campaign. Along the same line, defendants note that a large number of states have campaign limits, some considerably lower than those in Proposition 208, and that the city of San Diego has campaign limits comparable to those found in the initiative. They then argue that these facts evidence that the limits are adequate. Second, while acknowledging that Proposition 208 would require changes in the way campaigns are conducted in this state, defendants maintain that nothing mandates the historic mode of campaigning. They contend in effect that plaintiffs' evidence demonstrates a difference in amount and not in kind and thus are an insufficient predicate for unconstitutionality under *Buckley*. Finally, they argue that since the plaintiffs attack the statute on its face, the question of the ability of candidates to mount meaningful campaigns is, of necessity, a predictive judgment, and that the court must accord substantial deference to the predictive judgments underlying the adoption of the initiative.

Defendants' arguments are, to say the least, not without substance. Nonetheless, for the reasons explained below, the court concludes that they cannot prevail against plaintiffs' evidence.

Defendants first reason that the limits approved in *Buckley* and the existence of campaign limits enacted by various local jurisdictions within California and in other states defeat plaintiffs' claim. While the court

*mann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Given the determination that the lower limits are not narrowly drawn, the court need not address the excrutiatingly complex doctrine of unconstitutional conditions. See this court's stab at the problem in a very different context. *Louisiana Pacific Corp. v. Beazer Materials & Services*, 842 F.Supp. 1243 (E.D.Cal.1994).

**36.** Concerning the voluntary or coercive nature of the expenditure limits the court found, *inter alia*, "Two candidates on an even footing with respect to other matters, including fundraising ability, will ordinarily accept the limits, because, in the context of California politics, failure to do so will mean that the other candidate will be able to spend effectively (at double or triple the "voluntary" limit), raise at twice the rate from individuals and political action committees, receive unlimited party funds and preferential ballot treatment. Accordingly, the expenditure limitations are coercive for similarly situated candidates, and as to those candidates, the court finds that as a matter of law they will operate as mandatory expenditure limits," *see* Finding. No. 292, and "[O]n the whole, and for most candidates, in most elections for state office, the provisions relating to campaign limits are coercive, in the sense that candidates will make a rational judgment that they cannot prevail in the election if they do not accept the expenditure limits." *See* Finding No. 293.

**37.** The problem is compounded by the fact that one effect of Proposition 208 is to divert campaign contributions from the candidate to independent expenditures, thus providing a source of campaign rhetoric which may drown out or at least dilute the candidate's own message.

agrees that defendants' contention bears on the question of sufficiency of the limits, this argument is not dispositive.

■ I begin by noting that in *Buckley*'s record "[t]here is no indication, however, that the contribution limitations imposed by the Act would have any dramatic adverse effect on the funding of campaigns and political associations." *Buckley*, 424 U.S. at 21. This contrasts with the instant record where the court has concluded that the contribution limits will prevent the marshaling of assets sufficient to conduct a meaningful campaign.[38] Nor is that conclusion undermined by the existence of campaign limits in other jurisdictions. The facts pertinent to each jurisdiction, such as the size of the district, the cost of media, printing, staff support, news media coverage, and the divergent provisions of the various statutes and ordinances undermines the value of crude comparisons. Judge Hogan observed that his conclusion that the provisions considered in his case prevented candidates from effective advocacy "is fact-dependent, drawn from all of the record evidence and an evaluation of the witnesses' credibility. Similar caps in another jurisdiction may not have the same severe impact upon First Amendment rights . . . , because the District of Columbia is *sui generis*." *National Black Police Assn. v. District of Columbia Bd. of Elections and Ethics*, 924 F.Supp. 270, 281 (D.D.C.1996), *vacated as moot* 108 F.3d 346 (1997). My conclusion is similarly fact-based, and I only amend the observation to suggest that every jurisdiction is *sui generis*, and thus every campaign contribution limitation must be judged on its own circumstances.[39]

Like their first argument, defendants' contention that there is nothing sacrosanct about the historic methods of campaigning and that all Proposition 208 does is require alteration in the method of campaigning, cannot be dismissed out of hand. Nonetheless, the court cannot agree that the initiative simply commands a change in degree and not in kind. Certain conditions, such as the fact that the size of the legislative districts in California precludes so-called retail politics, the cost of advertising in this state, the general lack of media coverage of legislative campaigns, the cost of overhead, all limit efforts to reduce cost.[40] Moreover, given that the limits will require the candidate to spend yet more time raising money since it must be raised from a greater number of donors, it is doubtful that there is anything the candidate could do to alter campaigns in meaningful ways.[41] This conclusion brings the court to the last of defendants' arguments, which is that given the "on its face" character of this suit, and thus the absence of firm experience, the court must give deference to the predictive judgment of the electorate necessarily to be implied from its adoption of Proposition 208.

38. In reality most candidates are put to a Hobson's choice. While on the one hand the contribution limits make it likely that the candidate will be unable to raise sufficient funds to mount a meaningful campaign, the expenditure limits also make it unlikely that a meaningful campaign can be conducted.

39. Nor is it clear that the existence of limits is a demonstration of their efficacy. The court found concerning San Diego's limits, *inter alia*, that: "Under the $250 contribution limits in San Diego, the new forms of fundraising that have emerged are self-financing by the candidate, coordinated giving by business employees and illegal money laundering." *See* Finding No. 117. Moreover, the court found that: "The experience of the FPPC has been that jurisdictions with contribution limits experience an increase in illegal money laundering." *See* Finding No. 118.

40. There may be a suggestion by intervenors that one effect of Proposition 208 is that it will have the happy result of reducing reliance on expensive professional campaign consultants. Without judging the desirability of such a consequence, it seems unlikely to have such an effect, at least in competitive races. The ubiquity of campaign consultants suggests that those whose futures are at stake value the contributions of consultants considerably more than the drafters of the initiative. Moreover, the expertise necessary for the design, targeting and timing of mailings, the creation, placement and timing of media campaigns, and other skills developed by campaign specialists are unlikely to be possessed by the average candidate.

41. The sanguine evaluation of the drafters that the candidates will find a way if required to not withstanding. Aside from time, raising money, whether by way of mail solicitation or fund raisers, itself costs money. Even volunteer precinct walkers cost money, both to supply them with campaign material, to organize them, and to poll to decide where to expend the effort.

■ Relying on a recent case, defendants assert that "Supreme Court precedent firmly establishes that 'courts must accord substantial deference to the predictive judgments' embodied in a statute." Intervenors Trial Brief at 24 (citing and quoting *Turner Broadcasting System, Inc. v. Democratic National Committee,* 512 U.S. 622, 665, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)). Intervenors' formulation, however, ignores the context of the quotation which requires federal courts to "accord substantial deference to the predictive judgments of Congress." *Id.* Thus, the deference recognized in *Turner* is the consequence, at least in part, of the constitutional delegation of legislative power to a coordinate branch of government, a factor not present in the instant case. Of course, this is not to say that the predictive judgments of state legislatures are not entitled to due weight. *See, e.g., Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 460, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981). It would seem odd, however, that this court would be required to give greater deference to the implied predictive judgments of a state's legislation than the state's own courts would. In this regard, California courts accord deference to the predictive judgments of their legislature on a sliding scale, according significant deference to economic judgments, *American Bank & Trust Co. v. Community Hospital,* 36 Cal.3d 359, 372, 204 Cal.Rptr. 671, 683 P.2d 670 (1984), but employing "greater judicial scrutiny" "[w]hen an enactment intrudes upon a constitutional right." *American Academy of Pediatrics v. Lungren,* 16 Cal.4th 307, 349, 66 Cal.Rptr.2d 210, 940 P.2d 797 (1997).

■ It is of course true that deference in the federal courts is not simply a function of the separation of powers doctrine. It also rests upon the legislative branch being "better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon ... complex and dynamic" issues. *Turner,* 512 U.S. at 665–66. Once again, given that the statutes at bar are the product of the initiative process, their adoption did not enjoy the fact gathering and evaluation process which in part justifies deference.[42]

■ In any event, the deference federal courts accord legislative predictive judgments "does not mean ... that they are insulated from meaningful judicial review altogether. On the contrary, we have stressed in First Amendment cases that the deference afforded to legislative findings does 'not foreclose our independent judgment of the facts bearing on an issue of constitutional law.'" *Id.* at 666 (quoting *Sable Communications of Cal., Inc. v. FCC,* 492 U.S. 115, 129, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989)). Thus, courts are obligated to "assure that, in formulating its judgments, Congress has drawn reasonable inferences, based on substantial evidence." *Id.*

Given the obligation to assure that the implied findings were based on substantial evidence, the matter went to trial. At the conclusion of that trial, the court made factual findings as to the ability of candidates to marshal sufficient assets to effectively communicate under the exigencies of campaigning in California. Because the court has concluded that the evidence commands a conclusion inconsistent with the implicit legislative finding, that implied finding cannot stand even after according it due deference.

For all the above reasons, the court concludes that the contributions limits must fail because they are set at a level precluding an opportunity to conduct a meaningful campaign.

## IV.

## SEVERANCE, REFORMATION AND INJUNCTIVE RELIEF

Having concluded that the anchor provisions of Proposition 208 are unconstitutional, a determination must be made as to whether those provisions are severable, since if they are not the entire proposition must fail. As I explain below, there are also significant questions of reformation and the relief appropri-

---

**42.** The court has found: "No systematic study was done in conjunction with Proposition 208."

*See* Finding No. 123.

ate under the circumstances. I turn first to the question of severance.

### A. *Severance*

▬▬▬ A federal court is empowered to determine whether an unconstitutional provision of a state statute can be severed. *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 506, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985). In doing so, federal courts apply state law. *Id.* Under California law, there are "three criteria for severability: the invalid provision must be grammatically, functionally, and volitionally separable." *Gerken v. FPPC,* 6 Cal.4th 707, 721–22, 25 Cal.Rptr.2d 449, 863 P.2d 694 (1993).

▬▬▬ Some of the provisions of Proposition 208, such as the limitation on contributions to and from political parties, Sections 85303 and 85304, to and from PACS, Sections 85301 and 85309, the aggregate limitations, Section 85310, and the transfer ban, Section 85306, appear to be justified solely on the basis that they are required to prevent subversion of the campaign limitation provisions. *See California Medical Ass'n v. FEC,* 453 U.S. 182, 198, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981). As to such provisions, I have previously explained that they cannot stand if the justifying provision is itself unconstitutional. *See SEIU,* 747 F.Supp. at 593. On the other hand, various provisions of Proposition 208 such as the spend down provision, Section 89519, the prohibition on the use of campaign funds for office expenditures, Section 85313, the provisions concerning disclosure in advertising, Sections 84501 through 84510, and the provisions concerning slate mailers, Section 84305.5, appear to have separate justifications and conceivably are constitutional if the limitation provisions are severable. Whether this initial impression is correct will require extended analysis.

Below the court will explain that it believes it appropriate to provide the California Supreme Court with an opportunity to decide if it wishes to determine at this time whether the provisions of Proposition 208 found unconstitutional are subject to reformation. Given that conclusion, and given the fact that California law controls severance, it appears appropriate to provide that Court with an opportunity to determine whether it wishes to determine at this time whether the provisions found unconstitutional here can and should be severed, and if so the extent of severance.

### B. *Reformation*

The California Supreme Court has recently examined its power to reform an otherwise unconstitutional statute. *Kopp v. FPPC,* 11 Cal.4th 607, 47 Cal.Rptr.2d 108, 905 P.2d 1248 (1995). That Court rejected "the view that a court lacks authority to rewrite a statute in order to preserve its constitutionality or that the separation of powers doctrine, which vests legislative power in the legislature and judicial power in the courts (California Const., art. IV, § 1; *id.,* art. VI, § 1), invariably precludes such judicial rewriting." *Id.* at 615, 47 Cal.Rptr.2d 108, 905 P.2d 1248.

▬▬▬ Instead, the California Supreme Court held that it would apply a two part test:

> "[A] court may reform—i.e., 'rewrite'—a statute in order to preserve it against invalidation under the Constitution, when we can say with confidence that (i) it is possible to reform the statute in a manner that closely effectuates policy judgment clearly articulated by the enacting body, and (ii) the enacting body would have preferred the reformed construction to invalidation of the statute."

*Kopp,* 11 Cal.4th at 660–61, 47 Cal.Rptr.2d 108, 905 P.2d 1248.

▬▬▬ A federal court, on the other hand, which derives its power from the federal Constitution and is bound by principles of federalism, has no power by virtue of California's separation of powers doctrine, or otherwise, to rewrite a state statute, even to save it from unconstitutionality. As the Ninth Circuit bluntly put it, it is "not within the province of [a federal] court to 'rewrite' [a state law] to cure its substantial constitutional infirmities." *Tucker v. State of Calif. Dept. of Education,* 97 F.3d 1204, 1217 (9th Cir.1996). Rather, federal courts "must take the state statute or municipal ordinance as written and cannot find the statute or ordinance constitutional on the basis of a limiting

construction supplied by it rather than a state court." *Eubanks v. Wilkinson,* 937 F.2d 1118, 1126 (6th Cir.1991). In sum, "a federal court may not supply new limiting language for a state statute to create constitutionality." *Id.* at 1120; *see also Hill v. City of Houston,* 789 F.2d 1103, 1112 (5th Cir.) ("a federal court may not itself provide a limiting construction of legislation that is not so readily susceptible"), *aff'd* 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987). Thus, although it is clear that where, consistent with the language employed, a federal court may construe a statute to save it from unconstitutionality, it "will not rewrite a state law to conform it to constitutional requirements." *Virginia v. American Booksellers Assn. Inc.,* 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988); *see also Erznoznik v. City of Jacksonville,* 422 U.S. 205, 216, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) (narrowing construction only permitted if the language is "easily susceptible of a narrowing construction").

■■■■ The difference between the power of this court and the California Supreme Court relative to reformation of state statutes supports an order providing the state court with an opportunity to reform the statute before this court issues a final judgment as to its constitutionality. Accordingly, the court will direct the defendants in this action to seek an original writ in the California Supreme Court inquiring as to whether reformation of Proposition 208 is proper, and if so the nature of that reformation. *See Kopp,* 11 Cal.4th at 660–61, 47 Cal.Rptr.2d 108, 905 P.2d 1248.

Given this determination, the court will also direct plaintiffs to seek that Court's views as to severance.[43] These orders attempt to balance, on the one hand, this court's obligation to resolve federal questions and, on the other, the state court's authority as the final word on the meaning of state statutes.

Given this view, the court must now consider what should be done pending the California Supreme Court's decision as to whether it wishes to consider severance and reformation, and, if so, pending its determination of those issues.

## C. Injunctive Relief

■■■■ I have previously noted that although the existence of a constitutional violation does not automatically answer the question of whether an injunction should issue, "only the strangest of circumstances would suggest that a violation of the Constitution would not be subject to equitable relief." *SEIU,* 721 F.Supp. at 1179. The burden on protected political expression that the court has found above is plainly an irreparable injury. *See, e.g., Lydo Enterprises, Inc. v. City of Las Vegas,* 745 F.2d 1211, 1213 (9th Cir.1984) ("any loss of First Amendment rights, even briefly, can constitute irreparable injury"). Moreover, no adequate legal redress is available for such a violation. Under these circumstances, issuance of a permanent injunction would be warranted. Because of the outstanding issues of severance and reformation, however, it appears to the court that a preliminary injunction should issue instead.[44]

---

**43.** Of course the granting of such a writ is wholly discretionary with the California Supreme Court. Whether or not that Court issues a writ, the parties are directed to return to this court for such proceedings as are appropriate following the California Court's decision.

**44.** A recent law review article has argued that it is "undesirable for a federal court to address the merits of the case to determine whether to grant interim relief." Hardy, *Federal Courts—Certification before Facial Invalidation: A Return to Federalism,* 12 W. New. Eng. L.Rev. 217, 241 (1990). The article suggests that "the state court may take the preliminary determination as an indication of how the federal court will ultimately rule on the merits and may view the injunction as an attempt to force the state court into interpreting the state law in accordance with the

federal court's preliminary interpretation." *Id.* I cannot agree. First, the argument undervalues the need for prompt relief where unconstitutional restrictions on First Amendment rights are concerned. This is particularly so where the issue is whether officers elected to govern a state and make its laws, all of whose acts will not be undone by a later determination of unconstitutionality, will be elected consistent with the fundamental law. Second, it underestimates the sturdiness of state courts in general, and the California Supreme Court in particular. If that court does not believe it appropriate to address the questions of severance and reformation for any reason, including its desire to await final action by this court or review of this court's decision by the Ninth Circuit or the Supreme Court, it is perfectly free to do so.

## V.

### CONCLUSION

There has been a suggestion by some members of Congress that in resolving questions of constitutional law district judges are relying on their view of the social good rather than the law. In my experience, that concern is unfounded. For myself, this court cannot emphasize the hesitancy it experienced in coming to the conclusion the a substantial portion of Proposition 208 fails the test of constitutionality. More to the point, perhaps, my conclusion as a judge does not necessarily accord with my view as a citizen.

In note 6 *supra,* this court quoted from the First Amendment, and observed how the plain words of the text inhibit any attempt by government to circumscribe the right of its citizens to full participation in the political process. As I have observed elsewhere, however, our Constitution is not only an "embodiment of our most precious values," it is also "a great document of practical governance." *Potter v. Rain Brook Feed Co., Inc.,* 530 F.Supp. 569, 580 (E.D.Cal.1982). In that regard, it is not inappropriate to ask whether the people do not have a right to restrain those who would buy elections or the elected. In answering that question I think it appropriate to remember Justice Jackson's profound dictum that if the Supreme Court does not temper "doctrinaire logic with a little practical wisdom, it will convert the constitutional Bill of Rights into a suicide pact." *Terminiello v. City of Chicago,* 337 U.S. 1, 37, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) (Jackson J., *dissenting*). Nonetheless, it is clear to this court that this particular effort at reform has failed.

## VI.

### ORDER

For all the above reasons, the court now ORDERS as follows:

1. The FPPC is ENJOINED from enforcing any of the provisions of Proposition 208 pending further order of the court;

2. Plaintiffs shall post a $100.00 bond;

3. The FPPC shall seek an original writ in the California Supreme Court, naming the parties here, which shall seek a determination as to whether the provisions of Proposition 208 are severable, and if severable how, and whether the statute is subject to reformation, and if so in what manner; and

4. The parties are directed to provide the court with a status report of the state court proceedings in the above-captioned case every sixty (60) days and further directed to notify this court within ten (10) days after the California Supreme Court issues a final decision.

IT IS SO ORDERED.