BOWMAN, Chief Judge.
Shrink Missouri Government PAC and Zev David Fredman (collectively, SMG) appeal from the decision of the District Court granting summary judgment to members of the Missouri Ethics Commission, Missouri Attorney General Jay Nixon, and St. Louis County Prosecuting Attorney Robert P. McCullough [1] (collectively, the State) on SMG’s challenge to certain provisions of Missouri’s campaign finance iaw. We reverse and remand.
I.
In July 1994, the Missouri legislature, by enacting Senate Bill 650 (SB650), adopted certain amendments to the state campaign finance law that, among other things, restrict the amount of campaign contributions that persons can make to candidates for public office. The limits were to become effective on January 1, 1995. In November 1994, the electorate approved Proposition A, a ballot initiative that imposed even more restrictive contribution limits than those contained in SB650. Proposition A became effective immediately upon voter approval. In December 1995, this Court held that the Proposition A limits on campaign contributions violated the First Amendment. See Carver v. Nixon, 72 F.3d 633 (8th Cir.1995), cert. denied, 518 U.S. 1033, 116 S.Ct. 2579, 135 L.Ed.2d 1094 (1996).[2] At that time, the limits of SB650 became effective.
Under the provisions of SB650 challenged here, “the amount of contributions made by or accepted from any person other than the candidate in any one election shall not exceed” $1,075 to candidates for governor, lieutenant governor, secretary of state, state treasurer, state auditor, or attorney general, or for any office where the population of the electoral district is 250,000 or more; $525 to candidates for state senator, or for any office where the population of the electoral district is 100,000 or more; and $275 to candidates for state representative, or for any office where the population of the electoral district is less than 100,000. Mo.Rev.Stat. § 130.032.1 (Supp.1997) (as amended early in 1998 by the Missouri Ethics Commission to account for inflation, see Mo.Rev.Stat. § 130.032.2 (Supp.1997)).
SMG, a political action committee organized and doing business in Missouri, and Fredman, a resident of and registered voter in Missouri and an unsuccessful candidate for the Republican party’s nomination for state auditor this election cycle, filed suit claiming that the limits violate their First Amendment rights of free speech and association. The parties filed cross motions for summary judgment; the District Court denied SMG’s motions for summary judgment and for in-junctive relief, and granted the State’s summary judgment motion. SMG filed a notice of appeal, and on July 27, 1998, we granted SMG’s motion for an injunction against en *521 forcement of the campaign contribution limits of SB650 pending appeal.
II.
We first address a question initially presented in the last few pages of the State’s brief. The State claims that SMG and Fred-man lack standing to challenge these contribution limits. We take up the question as our first matter of business, because we lack jurisdiction to entertain the appeal if both SMG and Fredman are without standing.
The State asserts that the injuries alleged are “contrived,” “conjectural,” and “hypothetical.” Brief of Appellees at 49, 50. We disagree. The State cannot make a persuasive argument that SMG and Fredman are not and have not been harmed by the limits imposed on campaign contributions by SB650. See Shrink Mo. Gov’t PAC v. Adams, No. 98-2351, Order at 3-4 (8th Cir. July 27, 1998) (order granting motion for injunction pending appeal). The only question, as we see it, is whether Fredman continues to have standing despite his loss as a candidate for statewide office in the August primary election. We hold that he does, as the State declined at oral argument to assure the Court that no recourse would be taken against those who, like Fredman, accepted campaign contributions in excess of the SB650 limits after July 27, 1998 (the date we ordered an injunction pending appeal), should the summary judgment be affirmed.
We hold that SMG and Fredman have standing to continue their challenge to the provisions of SB650 here at issue.
III.
We proceed now to the merits, reviewing the decision to grant summary judgment de novo. The question before us is straightforward: do the SB650 limits on political campaign contributions violate SMG’s and Fred-man’s First Amendment rights of free speech and association?
The State insists, as it did in Carver, that campaign contribution limits are subject only to intermediate scrutiny, not the “rigorous standard of review” employed by the Court in Buckley v. Valeo, 424 U.S. 1, 29, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per cu-riam). But as we noted in Carver, the Supreme Court “articulated and applied a strict scrutiny standard of review” to the federal contribution limits that were under challenge in Buckley, and “has not ruled that anything other than strict scrutiny applies in cases involving contribution limits.” Carver, 72 F.3d at 637; see also Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, Cal., 454 U.S. 290, 294, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981) (“[Rjegulation of First Amendment rights is always subject to exacting judicial review.”); Russell v. Burris, 146 F.3d 563, 567 (8th Cir.1998), cert. denied, 67 U.S.L.W. 3332, — U.S. —, 119 S.Ct. 510, — L.Ed.2d — (1998) (Nos. 98-397, 98-399). The State must demonstrate, therefore, that it has a compelling interest and that the contribution limits at issue are narrowly drawn to serve that interest. See Buckley, 424 U.S. at 25, 96 S.Ct. 612; Russell, 146 F.3d at 567; Carver, 72 F.3d at 638.
A.
The State contends that its compelling interest is in avoiding the corruption or the perception of corruption brought about when candidates for elective office accept large campaign contributions. The State further posits, citing Buckley, that corruption and the perception thereof are inherent in political campaigns where large contributions are made, and that it is unnecessary for the State to demonstrate that these are actual problems in Missouri’s electoral system. Recent precedent from this Court is to the contrary. In both Carver and Russell, we were not satisfied with the mere contention that the states have an interest (an indisputably compelling interest, see Day v. Holahan, 34 F.3d 1356, 1365 (8th Cir.1994), cert. denied, 513 U.S. 1127, 115 S.Ct. 936, 130 L.Ed.2d 881 (1995)) in maintaining the integrity of their elections. We required some demonstrable evidence that there were genuine problems that resulted from contributions in amounts greater than the limits in place. See Russell, 146 F.3d at 568 (“The defendants must prove first that there is real or perceived undue influence or corruption at *522 tributable to large political contributions ____”) (emphasis added); id. at 569 (noting that none of the defendants “provided any credible evidence” of actual corruption, nor had they proved a perception of corruption); Carver, 72 F.3d at 638.[3]
In reaching its conclusions concerning the constitutionality of federal campaign contribution restrictions, the Buckley Court noted the perfidy that had been uncovered in federal campaign financing in 1972. See 424 U.S. at 27 n. 28, 96 S.Ct. 612. But we are unwilling to extrapolate from those examples that in Missouri at this time there is corruption or a perception of corruption from “large” campaign contributions, without some evidence that such problems really exist. See Russell, 146 F.3d at 569; Carver, 72 F.3d at 638. We will not infer that state candidates for public office are corrupt or that they appear corrupt from the problems that resulted from undeniably large contributions made to federal campaigns over twenty-five years ago. The State therefore must prove that Missouri has a real problem with corruption or a perception thereof as a direct result of large campaign contributions.
For its evidence, the State relies on the affidavit of the state senator who eo-chaired the Interim Joint Committee on Campaign Finance Reform when the contribution limits were enacted. That senator pointed to no evidence that “large” campaign contributions were being made in the days before limits were in place, much less that they resulted in real corruption or the perception thereof. See Buckley, 424 U.S. at 28, 96 S.Ct. 612 (noting that “the problem of large campaign contributions [is] the narrow aspect of political association where the actuality and potential for corruption have been identified”) (emphasis added). The senator did not state that corruption then existed in the system, only that he and his colleagues believed there was the “real potential to buy votes” if the limits were not enacted, and that contribur tions greater than the limits “have the appearance of buying votes.” Affidavit of Senator Wayne Goode at ¶ 9. His statement that “[t]he greater the contribution, the greater potential there is for the appearance of and the actual buying of votes,” id., is conclusory and self-serving, given the senator’s vested interest in having the courts sustain the law that emerged from his committee. There is no way for us to tell whether this single legislator’s perception of corruption is the “public perception,” whether it is objectively “reasonable,” and whether it “derived from the magnitude of ... contributions” that historically have been made to candidates running for public office in Missouri. Russell, 146 F.3d at 569.
As a matter of law, the State has failed to come forward with evidence to prove a compelling interest that would be served by the restrictions SB650 imposes on campaign contributions. In fact, the State has been unable to adduce sufficient evidence even to show that there exists a genuine issue of material fact regarding its alleged interest. Therefore, the limits here cannot withstand constitutional challenge.
B.
Even if the State had come forward with evidence sufficient to show that it had a compelling interest in enacting and enforcing campaign contribution limits, it cannot demonstrate that the SB650 limits on the amount of campaign contributions are narrowly tailored to serve that interest. That is, we can say as a matter of law that the limits at issue here are so small that they run afoul of the Constitution by unnecessarily restricting protected First Amendment freedoms.
After inflation, limits of $1,075, $525, and $275 cannot compare with the $1,000 limit *523 approved in Buckley twenty-two years ago.[4] We previously have acknowledged that the Court in Buckley did not declare that limits of less than $1,000 on contributions are unconstitutional per se, but we also recognize that the $1,000 figure provides us with something of a benchmark. See Day, 34 F.3d at 1366. In today’s dollars, the SB650 limits appear likely to “have a severe impact on political dialogue” by preventing many candidates for public office “from amassing the resources necessary for effective advocacy.” Buckley, 424 U.S. at 21, 96 S.Ct. 612. Even if the State had demonstrated a compelling interest, the limits set by SB650, absent the State’s having proven the actual necessity for such a heavy-handed restriction of protected speech, can only be regarded as “too low to allow meaningful participation in protected political speech and association, and thus ... not narrowly tailored to serve” the alleged interest. Day, 34 F.3d at 1366.
In the circumstances presented here, we do not believe that we run the risk of attempting to “fine tun[e]” the work of the Missouri legislature, or that we otherwise are exercising authority that is not ours in order to hold that these limits are overly restrictive of freedoms protected by the First Amendment. Buckley, 424 U.S. at 30, 96 S.Ct. 612. We so conclude because the difference between these limits of $1,075, $525, and $275, and larger dollar limits that might be constitutionally sound (that is, narrowly tailored to serve a compelling state interest), are not “distinctions in degree” but “differences in kind.” Id. But see Kentucky Right to Life, Inc. v. Terry, 108 F.3d 637, 648 (6th Cir.1997) (holding that “$1,000 limitation on direct contributions in connection with local and state elections in Kentucky is not different in kind from the $1,000 limitation on direct contributions in connection with federal elections upheld in Buckley”), cert. denied, - U.S. -, 118 S.Ct. 162, 139 L.Ed.2d 106 (1997). Although, like the Court in Buckley, we are not prepared to state definitively what difference would be one of “degree” as compared with one of “kind,” we can say these limits are overly restrictive as a matter of law. We again remind the State that it has the burden of showing that any limits it places on campaign contributions are narrowly tailored to serve the State’s compelling interest in addressing proven “real or perceived undue influence or corruption attributable to large political contributions.” Russell, 146 F.3d at 568. Once those who would regulate and limit constitutionally protected political speech satisfy their heavy burden of proof, the problem of judicial line-drawing can be expected largely to disappear.
IV.
In sum, the campaign contribution limits at issue in this case, even with the biennial adjustments for inflation that SB650 provides, violate SMG’s and Fredman’s First Amendment rights of free speech and association. The judgment of the District Court is reversed and the case is remanded with instructions to enter summary judgment for SMG and Fredman.

. Although counsel for the prosecuting attorney spells the name of his client differently, we use tlie spelling as it appeared in the original complaint and as it still appears in the caption of this case.

. We did say in Carver that "we generally accept the limits established by the legislature.” 72 F.3d at 641. But even if that comment could be construed to mean that the Court believed the SB650 limits to be constitutional (an excessively broad reading, we think), it is obiter dictum and is not binding on the Court in this case.

. On the subject of the State’s burden to prove its compelling interest, this Court in Carver quoted (with some alterations by the Caiver Court) the following passage from United States v. National Treasury Employees Union, 513 U.S. 454, 475, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995), which in turn quoted Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 664, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (plurality opinion of Kennedy, J.): " 'When the Government defends a regulation on speech ... it must do more than simply "posit the existence of the disease sought to be cured.” ... It must demonstrate that the recited harms are real, ... and that the regulation will in fact alleviate these harms in a direct and material way.’ ”

. SMG contends that $1,075 in 1976 dollars is the equivalent of just $378 in purchasing power today. The State argues that SMG's use of the Consumer Price Index (CPI) to calculate the effects of inflation on dollars spent for campaign contributions is inappropriate. Nevertheless, the State has not come forward with any other measure it deems more appropriate. In fact, the subsection of SB650 that provides for the biennial adjustment of the contribution limits to account for inflation relies on the CPI for the calculation. See Mo.Rev.Stat. § 130.032.2 (Supp.1997).