**John V. FRANK, et al., Plaintiffs,**

v.

**CITY OF AKRON, et al., Defendants.**

**No. 5:98CV2862.**

United States District Court,
N.D. Ohio,
Eastern Division.

Dec. 2, 1999.

Robert M. Gippin, Karen M. Doty, Buckingham, Doolittle & Burroughs, Akron, OH, for plaintiffs.

Cheri B. Cunningham, Max Rothal, City Of Akron, Law Department, Akron, OH, for Akron, City of, defendant.

Warner DeWitt Mendenhall, III, Akron, OH, for Bruce Kilby, Mike Parsons, Patricia Longville, intervenors-defendants.

Brian J. Williams, Akron, OH, for Yes on Issue 11 Campaign, Gregory D. Coleridge, intervenors-defendants.

## MEMORANDUM OF OPINION AND ORDER

POLSTER, District Judge.

Before the Court is Plaintiffs' motion for summary judgment challenging a campaign finance reform amendment to the City of Akron's Charter passed by ballot initiative in November 1998 (Doc. No. 36). Defendant City of Akron has filed a response (Doc. No. 44), as have Intervening

Defendants "Yes on Issue 11 Campaign" and Gregory D. Coleridge (Doc. No. 57), and Intervening Defendants Mike Parsons, Bruce Kilby, and Patricia Longville (Doc. No. 58). Specifically, Plaintiffs seek summary judgment declaring Sections 5(C), (D),(G)(1) and (G)(2) of the City of Akron's Charter Amendment unconstitutional. Plaintiffs further seek an order permanently enjoining the enforcement of these provisions.

For the reasons that follow, Plaintiffs' Motion for Summary Judgment (Doc. No. 36) is GRANTED with respect to Sections 5(C), (D), and (G)(1) of the Charter Amendment. Plaintiffs' motion is, DENIED with respect to Section 5(G)(2) since the Court finds that this provision is not unconstitutional and may be enforced.

## I. BACKGROUND FACTS

On November 3, 1998, an overwhelming majority of the voters in the City of Akron supported issue 11, a ballot initiative, which amended the City Charter to add a section on Campaign Finance Reform. The Charter Amendment sets limits on the amount of campaign contributions and loans, requires disclosure of a contributor's home address and primary employer, and places restrictions on the fund-raising season for political campaigns.[1]

On December 10, 1998 the instant action was filed by the following six individual plaintiffs: John V. Frank, Marco Summerville, John W. Valle, Robert G. Konstand, Nancy Heslop, and Charles Walker. Each of the Plaintiffs are residents of the City of Akron who have participated in and who desire to continue to participate in electoral politics by, among other activities, making and receiving campaign contributions or loans. Together they brought this action for injunctive and declaratory relief alleging that the Akron Campaign Finance Charter Amendment is unconstitutional as a matter of law.

1. A copy of the Charter Amendment is attached as Exhibit A.

Plaintiffs maintain that the Ordinance abridges their rights of free speech, free association and equal protection of the laws under the First and Fourteenth Amendments to the Constitution of the United States. In addition, Plaintiffs claim that provisions of the Ordinance are vague and overbroad, thereby depriving them of rights secured under the First and Fourteenth Amendments of the Constitution and the laws of the State of Ohio.

On December 15, 1998, by Stipulation and Order, a Preliminary Injunction was entered enjoining the enforcement of Sections 5(B), (C), (D), (E), (F), (G)(2) and (I) of the Charter of the City of Akron.

On December 16, 1998 Bruce Kilby, Mike Parsons and Patricia Longville filed a Motion to Intervene as party defendants in the case. (*Doc. No. 6.*) On December 22, 1998, a group of citizens identified as "Yes on Issue 11 Campaign" together with Gregory D. Coleridge similarly filed a Motion to Intervene. (*Doc. No. 10.*) Both motions to intervene were granted by the Court on January 11, 1999.

A Case Management Conference was conducted on February 22, 1999, with all parties or their representatives in attendance. On April 8, 1999, the Court conducted a Status Hearing, which was followed by a telephonic status hearing on April 15, 1999.

On May 15, 1999, Plaintiffs filed a Motion for Partial Judgment on the Pleadings, arguing that Sections 5(B), (E), (F) and (I) of the Charter Amendment are unconstitutional on their face.[2] (Doc. No. 30). Arguably conceding the fact that such provisions violated the First Amendment, neither group of Intervening Defendants filed any opposition to this pleading. By Order of June 9, 1999, the Court granted Partial Judgment on the Pleadings as to Sections 5(B), (E), (F) and (I) of the Charter Amendment, declaring the same to be *null and void.*[3] (Doc. No. 33).

The *remaining four* Subsections, namely C, D, G(1) and G(2) of Section 5, are the subject of the instant Motion for Summary Judgment filed by the Plaintiffs on June 25, 1999. As described below:

*Subsection C* sets a *cash* contribution limit of $25 to any candidate for Mayor or City Council within any fundraising season.

*Subsection D* sets a *noncash* contribution limit for a Mayoral or At–Large Council candidate at $300, and for a Ward Council candidate at $100, from any person, campaign committee, political party or political action committee, per election cycle.

*Subsection G(1)* requires disclosure of the home address of all persons who make any financial contribution or loan to any campaign for municipal office (regardless of the amount of contribution.)

*Subsection G(2)* requires the identification and disclosure of the primary employer of every person who contrib-

2. These subsections limited the fund-raising season from the 1st day of December prior to the General Election until the Thursday preceding the General Election, and prohibited any fund-raising activity at any other time (Subsection B); provided that no more than 25% of a candidate's aggregate contributions could be comprised of contributions from nonresidents (Subsection E); required any surplus campaign funds to be deposited into the General Fund for the City of Akron or to one or more local charities within 60 days following a General Election (Subsection F), and provided a criminal penalty for any violation of the Charter Amendment (Subsection I).

3. Many of the provisions of the Ordinance were so clearly unconstitutional that even the Intervening Defendants did not contest the Court's granting partial judgment on the pleadings to the Plaintiffs and permanently enjoining implementation and or enforcement of those provisions. The section limiting the percentage of a candidate's funds that could be raised from contributors outside the Akron city limits, for example, would have the effect of absolutely prohibiting certain individuals, who might work in the City of Akron but reside elsewhere, from contributing to the candidate of their choice.

utes $50 or more to any campaign for municipal office.

Plaintiffs urge that established precedent demonstrates that the overall contribution limits of the Charter Amendment cannot withstand scrutiny in a city of this size, as a matter of law. "The cash contribution limits and disclosure requirements are moreover clearly unconstitutional on their face, without the need for a comparative analysis between Akron and other political entities." *Plaintiffs' Br. at 3.*

From the outset, the City of Akron has taken the position that the entire Charter Amendment is manifestly unconstitutional. In its response, the City of Akron affirmatively states that it concurs with Plaintiffs' analysis of the pertinent case law as well as Plaintiffs' conclusions that the challenged sections are unconstitutional. *Defendant's Br. at 1.* Hence, Plaintiff and Defendant agree that adjudication of this matter is readily amenable to summary judgment as it is purely a question of law to be determined by the Court.

The Intervening Defendants, however, vigorously oppose the granting of summary judgment and argue that Plaintiffs have not met their burden under Federal Rule of Civil Procedure 56.[4] They further reiterate their objection to the Court's denial of discovery in this matter, arguing for their right to uncover the true existence of corruption in the City of Akron's political arena.[5] In support of their opposition and contentions, Intervening Defendants sub-mitted two substantial Evidentiary Appendices pursuant to Rule 56(e).

## II. *SUMMARY JUDGMENT STANDARD*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmoving party. *See LaPointe v. United Autoworkers Local 600,* 8 F.3d 376, 378 (6th Cir.1993).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson,* 477 U.S. at 247–248, 106 S.Ct. 2505. In order for there to be a genuine issue for trial, there must be sufficient evidence favoring the nonmoving party for a jury to return a

---

**4.** The Intervening Defendants also challenge Plaintiffs' standing to bring this action, alleging that Plaintiffs have failed to show an injury in fact, or a personal stake in the case. *Intervening Defendant's Resp. (Doc. No. 57) at 10–11 and (Doc. No. 58) at 8–9.*

But see *Plaintiffs' Reply (Doc. No. 67) at 14–18* and the cases cited therein. Where "plaintiffs allege an intention to engage in a course of conduct arguably affected with a constitutional interest which is clearly proscribed by statute, courts have found standing to challenge the statute even absent a specific threat of enforcement." *United Food & Commercial Workers International Union v. IBP, Inc.,* 857 F.2d 422, 428 (8th Cir.1988).

Accordingly, Intervening Defendants' arguments with respect to Plaintiffs' standing are without merit.

**5.** On July 28, 1999, the Court entered an Order denying the Intervening Defendants' motion for leave to seek discovery that would allegedly lead to evidence of real corruption within the City of Akron. Reasoning that such discovery would only serve as a "fishing expedition," the Court ruled that such additional discovery was not necessary in order to obtain facts essential to justify the party's opposition to the motion for summary judgment. (Doc. No. 49).

verdict for that party. *Id.* at 249, 106 S.Ct. 2505. Having discussed the Rule 56 standard of review, the Court now turns to the merits.

## III. *ANALYSIS*

The touchstone of the constitutional analysis of campaign finance restrictions remains *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). It is established that "contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities." *Id.* at 14, 96 S.Ct. 612. In *Buckley,* the plaintiffs brought First Amendment challenges to various provisions of the Federal Election Campaign Act of 1971, which included a $1,000 limitation on federal campaign contributions.

In evaluating the limitations on both political contributions and expenditures, *Buckley* established that "contribution and expenditure limitations impose direct quantity restrictions on political communication and association by persons, groups, candidates, and political parties." *Id.* at 18, 96 S.Ct. 612. Striking down the limitations placed upon campaign *expenditures,* but upholding a $1000 limitation on campaign *contributions,* the Court ruled that while limitations on contributions burden First Amendment rights, such limits are not as constitutionally suspect as expenditure limitations. It explained that the *expenditure* limits

> necessarily reduce[ ] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached (footnote omitted). This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money.

*Id.* at 19, 96 S.Ct. 612. However, by contrast, the Court noted that *contribution* limits

entail[ ] only a marginal restriction upon the contributor's ability to engage in free communication. A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution.... A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication.

*Id.* at 20–21, 96 S.Ct. 612. See also *Id.* at 23, 96 S.Ct. 612 (concluding that the Act's "expenditure ceilings impose significantly more severe restrictions on protected freedoms of political expression and association than do its limitations on financial contributions.")

In view of these fundamental concerns, the Court held that campaign contribution limits are "subject to the closest scrutiny." *Buckley,* 424 U.S. at 25, 96 S.Ct. 612 (quoting *NAACP v. Alabama,* 357 U.S. 449, 460–61, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)).[6] Under this standard, the Supreme Court set forth a two part balancing test which provides that "a significant interference with protected rights of political association may be sustained" *only if* the defendant can demonstrate "a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* at 25, 96 S.Ct. 612; *See also Carver v. Nixon,* 72 F.3d 633, 636–638 (8th Cir.1995).

In upholding the constitutionality of the $1,000 contribution limit for federal elected offices, the *Buckley* Court reasoned that the $1,000 limit focused precisely on the problem of large campaign contributions and, therefore, was narrowly tailored to the goal of limiting corruption and the appearance of corruption. *Buckley,* 424 U.S. at 26–28, 96 S.Ct. 612. However, the

---

**6.** While the *Buckley* Court did not employ strict scrutiny language, subsequent case law makes clear that strict scrutiny applies.

*Shrink Missouri Government PAC v. Adams,* 161 F.3d 519 (8th Cir.1998); *Kruse v. City of Cincinnati,* 142 F.3d 907, 913 (6th Cir.1998).

Court recognized that "contribution restrictions *could have a severe impact* on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy." *Id.* at 21, 96 S.Ct. 612 (emphasis added).

Although the Supreme Court declined to analyze the propriety of the specific dollar amount of the contribution limits, it nevertheless cautioned that if the contribution limits were *too low*, the limits could indeed be unconstitutional. *Id.* at 30, 96 S.Ct. 612.[7]

### A.

The Intervening Defendants, who were among the major sponsors of the successful initiative which produced the Akron Campaign Finance Ordinance, wished to conduct discovery to prove that there is a substantial amount of corruption in Akron. The Court has determined that the level of corruption in the City of Akron, if any, is not relevant to the Constitutional inquiry that must be made. For even if there is no corruption whatsoever, the citizens have an interest in keeping things that way. Courts have consistently held that preventing corruption or even the appearance of corruption is a compelling state interest (see discussion below). It is for this reason that the Court determined that this case was ripe for summary judgment without the need to conduct discovery.

The exponential increase in campaign fund-raising and expenditures for offices at all levels of government is a threat to the American system of participatory democracy. Fund-raising has become an all-consuming task for too many public officials, and there is growing concern about the effect of all this campaign money on the quality and character of official decision making. So long as *Buckley v. Valeo*

is the law of the land, however, campaign contributions and expenditures must be treated as a form of political expression protected by the First Amendment. Any limitations must be subject to the closest scrutiny, and the Court must determine if there would be less intrusive measures which might accomplish the same objective.

### B.

Viewed in this light, this Court must now examine whether the limitations and restrictions in the City of Akron's Campaign Finance Reform Charter Amendment demonstrate "a sufficiently important interest" and whether they "employ[ ] means closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley*, 424 U.S. at 25, 96 S.Ct. 612.

Addressing the first prong of this balancing test, the Court must determine whether the governmental interests advanced in support of the Campaign Finance Reform are sufficiently compelling to permit the City of Akron to restrict First Amendment freedoms.

In *Buckley*, the Court found that "the prevention of corruption and the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office" was a compelling state interest. *Id.* at 25, 96 S.Ct. 612. The Supreme Court reiterated this position five years later, holding that *"Buckley* identified a single narrow exception to the rule that limits on political activity were contrary to the First Amendment. The exception relates to the perception of undue influence of large contributors to a candidate." *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290, 296–97, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981) (emphasis omitted).

Subsequently, in *Federal Election Commission v. National Conservative Politi-*

---

**7.** *Buckley* stressed that the judiciary "has no scalpel to probe" specific dollar limitations. "Such distinctions in degree become significant only when they can be said to amount to differences in kind." *Id.* at 30, 96 S.Ct. 612.

Thus, this Court does not sit to second guess the majority of the voters of the City of Akron as to the size of the limit. Rather, this Court must only determine whether the limitations are within the constitutional parameters.

cal Action Committee, 470 U.S. 480, 496–97, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985), the Supreme Court announced that "[p]reventing corruption or the appearance of corruption are the *only* legitimate and compelling government interests thus far identified for restricting campaign finances." (emphasis added). *See also Kruse v. City of Cincinnati,* 142 F.3d 907, 913 (6th Cir.1998). The Supreme Court has consistently held that preventing perceived corruption is indeed a compelling state interest. *Kentucky Right to Life, Inc. v. Terry,* 108 F.3d 637 (6th Cir.1997) (citing *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 658, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990)).

In the instant action, the Intervening Defendants maintain that the limitations and restrictions on political contributions within the City of Akron represent a substantial and compelling interest because they serve to prevent corruption and the undue influence that is associated with large contributions.[8] The *Preamble* to the Campaign Finance Reform Charter Amendment succinctly sets forth the purpose and the compelling governmental interest that motivated the citizen initiative:

In order to demonstrate and promote ethics by government within the City of Akron; to further integrity in campaigns for public office; to prevent corruption and/or the appearance of corruption; and to restore and enhance the faith of the citizenry in government, we the people of this City do hereby establish this Amendment to the Charter of the City of Akron on Campaign Finance Reform.

*Supplement to Complaint; Exhibit 1, Section 5(A).*

While mindful of the approach taken by the Eighth Circuit in *Shrink Missouri Government PAC v. Adams* (requiring documented *proof* of *actual problems stemming from corruption* before it would even consider whether the government had established a compelling state interest),[9] this Court chooses to follow the overwhelming line of authority which provides that safeguarding the integrity of a political system is a substantial and a compelling interest. Moreover, this Court recognizes that avoiding even the appearance of corruption in the political process demonstrates a compelling state interest. Accordingly, the Court finds that the City of Akron's Campaign Finance Reform was prompted by "a sufficiently important interest" to justify regulation.

## C.

Having established a compelling state interest in regulating campaign contribu-

8. In evaluating the first prong of the *Buckley* balancing test, neither the Plaintiffs nor the City of Akron vigorously challenge the legitimacy or sufficiency of the compelling state interest advanced by the Intervening Defendants. Instead, their arguments are primarily focused on the second prong of the applicable First Amendment analysis, i.e. *whether the limitations and restrictions are narrowly tailored to achieve a compelling governmental interest.*

9. In *Shrink Missouri Government PAC v. Adams,* 161 F.3d 519, 521–22 (8th Cir.1998), the Eighth Circuit expressed its dissatisfaction with the *mere contention* that the states have an interest in maintaining the integrity of their elections and refused to find a compelling state interest absent proof of "a real problem with corruption or a perception thereof as a direct result of large campaign contributions." *Id.* Requiring "demonstrable

evidence of ... genuine problems that resulted from contributions in amounts greater than the limits," the Court held as a matter of law, the State had failed to come forward with evidence to prove a compelling interest that would be served by the restrictions on the campaign contributions. *Id.* at 522.

Challenging the Eighth Circuit's decision, the state filed its appeal to the United States Supreme Court. Granting certiorari on January 25, 1999, (*Nixon v. Shrink Missouri Government PAC,* 525 U.S. 1121, 119 S.Ct. 901, 142 L.Ed.2d 901, case no. 98–963), the Supreme Court heard oral arguments on October 5, 1999. With a decision now not likely until spring, we must wait and see whether the Eight Circuit's approach will be upheld. In no uncertain terms, this appeal challenges the continued validity of the limits imposed by *Buckley v. Valeo* more than 23 years ago.

tions, the governmental body of the City of Akron must also prove that these challenged provisions of the Charter Amendment are narrowly tailored to serve that interest. At this second stage of analysis, the Court must now determine whether, in establishing these contribution limits, the City has employed means closely drawn to avoid unnecessary abridgement of First Amendment rights.

■ It is undisputable that a court must strike down a challenged regulation that is "not narrowly tailored to achieve a compelling governmental interest." *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 347, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995); *Carver,* 72 F.3d at 638; *Buckley,* 424 U.S. at 25, 96 S.Ct. 612. It is *this* second prong of the *Buckley* test which frames the overriding issue in this case. And, it is this second stage of analysis that leads this Court to conclude that three of the remaining four limitations in the City of Akron's Campaign Finance Reform Amendment pose an unconstitutional burden on political speech and association. *Buckley,* 424 U.S. at 25, 96 S.Ct. 612. For the reasons that follow, the Court finds that these limitations on campaign contributions have not been so narrowly tailored to survive the constitutional scrutiny which must be applied.

### 1. $300 limit for Mayor; $100 limit for City Council:

■ Examining each of the four challenged provisions individually, Section 5(D) of the City of Akron's Charter Amendment provides:

> D. *LIMITS ON NONCASH MONETARY AND IN–KIND CONTRIBUTIONS AND LOANS.* No candidate for Mayor or At–Large Council shall accept or solicit, as a noncash monetary (i.e. checks, money order, credit cards) or in-kind campaign contribution or loan, more than $300 from any person, campaign committee, political party, or political action committee. No candidate for a Council Ward position shall accept or

solicit, as a noncash monetary or in-kind campaign contribution or loan, more than $100 from any person, campaign committee, political party, or political action committee. No person, political action committee, political party or political campaign shall contribute funds or in-kind contributions in excess or said amounts. Contributions from the candidates and labor of volunteers are exempt from these provisions.

*Supplement to Complaint; Exhibit 1, Section 5(D).*

Over twenty-three years ago, the *Buckley* Court found that a $1,000 limit was sufficient to pass constitutional muster because it was narrowly tailored to serve the state's interest in preserving the integrity of the political system. Today, the Intervening Defendants are contending that contribution limits three to ten times *less than* that those upheld in *Buckley* should similarly pass constitutional muster because, they too, are narrowly tailored to address the corrupting influence of money.

The Intervening Defendants maintain that:

> For elections in which one or two thousand people were voting, the Ward level elections, $100 *seemed to* provide a reasonable balance between the corrupting power of money, the right of people to donate to council candidates, and the need for candidates to raise the two to five-thousand dollars needed to run a successful campaign.

> For elections in which twenty-thousand people were participating, the At-large and Mayoral races, $300 *seemed to* provide the proper balance between Constitutional rights and the threat of corruption and yet leave room for candidates to raise ten to forty-thousand dollars necessary for such campaigns.

*Intervening Defendants Mem. In Opp'n (Doc. No. 58) at 5–6 (emphasis by the Court).*

The Intervening Defendants seek to justify the $100 and $300 contribution limits

with reference to what they say are appropriate overall spending limits ($5,000 and $40,000.) However, *Buckley* teaches us that expenditures *cannot* be limited. *Buckley*, 424 U.S. 1, 96 S.Ct. 612; *Kruse v. City of Cincinnati*, 142 F.3d 907 (6th Cir. 1998). To limit expenditures indirectly, by imposing extremely low contribution limits, would also be unconstitutional.

Having reviewed the applicable case law, the Court has concluded that there is no Sixth Circuit precedent.[10] Arguing that there *is* a similar case with binding application, the Intervening Defendants cite to *Kentucky Right to Life, Inc. v. Terry*, 108 F.3d 637 (6th Cir.1997) stating that "the Sixth Circuit ... upheld a *statewide* limitation of $500.00," and therefore, "$100.00 for a ward race and $300.00 for a city wide race is reasonably designed based upon the level of participation in municipal elections." *Intervening Defendants' Resp. (Doc. No. 57) at 19.*

In *Terry*, First Amendment challenges were made to sections of the Kentucky Campaign Finance Law setting monetary limitations on political contributions. Among other limitations, the statute prohibited any candidate or campaign committee from accepting a contribution of more than $500 from any one person, committee or organization in any one election. It also limited annual aggregate contributions by individuals to all permanent committees to $1,500.

While the Sixth Circuit did find the statute withstood constitutional challenge, it did *not* uphold a $500 limitation as the Intervening Defendants argue. A *complete* reading of *Terry* discloses that before

it was even considered by the Sixth Circuit, the Kentucky General Assembly amended the statute, directly affecting several of the challenged provisions on appeal. The amendment *raised* the dollar limitations on contributions by individuals and permanent committees from $500 to *$1,000*, thereby eliminating the necessity of examining the constitutionality of a $500 cap. *Terry*, 108 F.3d at 643 and n. 19.

Intervening Defendants also cite *Terry* in urging this Court to apply the Sixth Circuit's analysis "recognizing the inherent differences between federal and local elections." *Intervening Defendants' Resp. (Doc. No. 57) at 19.* Distinguishing the Kentucky limitations from those imposed in federal elections, the Sixth Circuit reasoned:

> Local and state elections in Kentucky simply do not involve the enormous financial contributions generally associated with federal elections. Consequently, a relatively small contribution to a local Kentucky campaign may create a substantial likelihood of corruption. Recognizing the inherent differences between federal and local elections expenditures, we believe that the $1,500 limit for Kentucky state and local elections does not amount to a difference in kind from the $25,000 limit upheld in *Buckley* in the context of federal elections.

*Terry*, 108 F.3d at 648, 649. While this Court too recognizes the inherent differences between a locally run campaign with that of a federal election, *Terry* does not save the low limits set by the City of Akron's Charter Amendment. The Court is certainly mindful of the fact that local elections do *not* involve the enormous fi-

---

**10.** Inferring that comparing similar cases elsewhere across the nation is fruitless, the Intervening Defendants state: "Akron voters decided $26.00 cash contribution[s], $101.00 contributions to ward council candidates and $301.00 to Mayoral or City Council At–Large candidates crossed the threshold from robust political advocacy into the nefarious world of political corruption. Comparing dollar amounts from across the country begs the question. Instead the focus should and must

be whether the limitation is 'integral to the effectiveness of the overall ... scheme of combating corruption in the political process.' *Buckley v. Valeo, supra* at 38, 96 S.Ct. 612." *Intervening Defendants', Resp. (Doc. No. 57) at 19.*

Contrary to Defendant–Intervenor's assertions, this Court chooses to review and compare the persuasive line of case law authority that does exist.

nancial contributions generally associated with federal elections. And it is also true that a relatively small contribution to a local campaign could create a substantial likelihood of corruption. But *Terry*'s $1,000 and $1,500 limitations in no way compare to the $100 and $300 limits imposed by the Akron Charter Amendment.

In *Day v. Holahan,* 34 F.3d 1356, 1365 (8th Cir.1994), the Eighth Circuit held that a Minnesota statute setting a $100 limit on contributions to or by political committees was so low that it infringed upon the citizens' First Amendment right to political association and free political expression. It found that the $100 limit "significantly impairs the ability of individuals and political committees and funds to exercise their First Amendment rights." *Id.* at 1366. The Court held that a $100 limit "is too low to allow meaningful participation in protected political speech and association, and thus is not narrowly tailored to serve the state's legitimate interest in protecting the integrity of the political system." *Id.*[11]

In *Carver v. Nixon,* 72 F.3d 633, 641 (8th Cir.1995), the Court invalidated campaign contribution limits contained in a citizen initiative passed by the Missouri electorate in the November 1994 election. The limits were set according to the district size: (1) $100 per candidate in districts with fewer than 100,000 residents; (2) $200 per non-statewide candidate in districts of 100,000 or more residents; and (3) $300 per statewide candidate (i.e., candidates seeking election to the office of Governor, Lieutenant Governor, Attorney General, Auditor, Treasurer, and Secretary of State).

Describing the initiative's limits as "dramatically lower" than those approved in *Buckley, id.* at 641–42, and lower, in fact,

than those of any other state, *id.* at 642, the *Carver* court concluded that the initiative's limits were "not closely drawn to reduce corruption or the appearance of corruption associated with large campaign contributions." *Id.* at 644.

Similarly, in *California Prolife Council v. Scully,* 989 F.Supp. 1282 (E.D.Cal.1998), the court found unconstitutional a California initiative which limited contributions to no more than $100 per election in small local districts (less than 100,000 residents), $250 per election for Senate, Assembly, Board of Equalization and large local districts, and $500 per election for statewide office. The Court found that while there was a legitimate governmental interest served by contribution limits, those limits were not narrowly drawn to achieve the legitimate purpose of preventing corruption or its appearance. "A statute is closely drawn when the means chosen do not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* at 1296. The court held that campaign contributions were restricted to a degree unnecessary to achieve the governmental purpose, and therefore violated the First Amendment. *Id.*

Finally, on facts quite similar to the case at bar, the District Court for the District of Columbia struck down limitations on contributions in *National Black Police Assoc. v. District of Columbia Bd. of Elections and Ethics,* 924 F.Supp. 270 (D.D.C. 1996). Political candidates, contributors, and political organizations brought an action against the District of Columbia and the Board of Elections challenging the constitutionality of a voter initiative restricting campaign contributions for *local* political candidates. Contributions to can-

---

**11.** *Day* took into account the effect of inflation in determining the constitutionality of campaign contribution limits. The Court looked to the $1000 limit in *Buckley* and applied an adjusted rate for inflation to formulate what the 1994 value of a $1000 was in 1976. The Court observed that "a $100 contribution in 1976 [the year that *Buckley* was decided] would have a value of $40.60 in 1994 dollars, or approximately four percent of the $1,000 limit approved in *Buckley*." *Day,* 34 F.3d at 1366. This observance about the effect of inflation was applied again, one year later in *Carver v. Nixon,* 72 F.3d 633, 641 (8th Cir.1995).

didates for Mayor, D.C. Council Chairman or at-large Council members were limited to a maximum of $100 per candidate, and contributions to ward Council member candidates or Board of Education member candidates were limited to a maximum of $50 per candidate. In addition, the initiative prohibited any contributor from giving more than $600 to all candidates in any one election.

Holding that the challenged limits failed *both* prongs of the *Buckley* test, the District Court enjoined the contribution limits as unconstitutional, finding "no evidence that the caps were closely drawn to prevent unnecessary abridgement of free speech rights" and that such limitations "impermissibly burdened candidates' First Amendment right to freedom of speech." 924 F.Supp. at 282. However, the Court of Appeals for the District of Columbia remanded the case [12] after concluding that (1) the case was mooted by the passage of legislation increasing the contribution limits [13], and (2) vacated the underlying opinion of the District Court.

Intervenor Defendants have not identified a case, in this circuit or elsewhere, in which a federal court has upheld such low contribution limits as those contained in the City of Akron's Charter Amendment. This Court has not found a case in which a federal court has sustained limits this low for a city as large as Akron, and numerous courts have struck down similar limitations.[14]

Unfortunately, in this day and age, $100 is a relatively insignificant amount of money. How can you tell a person he or she can't spend more supporting a candidate for City Council than it costs to take a family of four to a major league baseball game? This Court is of the belief that the $100 and $300 limits will significantly impair the ability of individuals in Akron to exercise their political rights. These limits are simply too low to allow for appropriately robust participation in protected political speech and association.

It is with considerable pause and deliberation that the Court strikes down the contribution limitations, because courts must accord substantial deference to the judgments of the electorate concerning the level of contribution limits. *California Prolife Council v. Scully*, 989 F.Supp. 1282 (E.D.Cal.1998). An ordinance or statute passed by citizen initiative or referendum is entitled to the same deference as one passed by a City Council or legislature. *Federal Election Comm'n v. National Right to Work Committee*, 459 U.S. 197, 210, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982); *Buckley*, 424 U.S. at 30, 96 S.Ct. 612.

However, that such ordinance is enacted directly by the voters rather than by the state legislature does not change the constitutional analysis. "[V]oters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation." *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290, 295, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981).

---

**12.** *National Black Police Assoc. v. District of Columbia*, 108 F.3d 346 (D.C.Cir.1997).

**13.** The new campaign legislation increased the contribution ceilings so that the limits became $2,000 for mayoral candidates, $1,500 for Council Chairman candidates, $1,000 for at-large Council member candidates, $500 forward Council member candidates and at-large Board of Education member candidates, and $200 forward Board of Education member candidates, and changed the maximum cap on contributions per election to $8,500. *National Black Police Association*, 108 F.3d at 348.

**14.** *Kentucky Right to Life, Inc. v. Terry*, 108 F.3d 637 (6th Cir.1997); *Shrink Missouri v. Adams*, 161 F.3d 519 (8th Cir.1998); *Carver v. Nixon*, 72 F.3d 633, 636–638 (8th Cir.1995); *Russell v. Burris*, 146 F.3d 563 (8th Cir.1998); *SEIU v. Fair Political Practice Comm.*, 955 F.2d 1312 (9th Cir.1992); *National Black Police Assoc. v. District of Columbia Bd. of Elections and Ethics*, 924 F.Supp. 270 (D.D.C. 1996); *California Prolife Council v. Scully*, 989 F.Supp. 1282 (E.D.Cal.1998).

While the Court may embrace the motivation of the sponsors of the initiative creating the Akron Campaign Finance Ordinance, and by inference the majority of the electorate which passed the legislation, the contribution limitation provisions of the Ordinance cannot survive constitutional challenge when measured against *Buckley* and its progeny. The dollar limitations on campaign contributions are simply too low and have not been tailored to minimize the chilling effect on political expression. Section 5(D) of the Charter Amendment is unconstitutional.

## 2. *Subsection C—$25 limitation on cash contributions:*

■ Plaintiffs also challenge Section 5(C), which effectively limits to $25 the amount any individual can contribute in cash to any one political candidate in any one election year.

C. *LIMITS ON CASH CONTRIBUTIONS.* No candidate for Mayor of City Council shall accept, as a campaign contribution, more than $25 in cash (i.e. hard currency) from any person within any fundraising season. No person shall contribute cash in excess of said amount.

*Supplement to Complaint; Exhibit 1, Section 5(C).*

Courts have sustained limitations on cash contributions to political campaigns, for the obvious reason that the system could not tolerate citizens handing public officials large amounts of cash. There is no question that restricting the amount of cash contributions that can be handed to a candidate is a permissible and fundamentally necessary limitation. Cash cannot be easily traced, and it is much easier to evade limitations with cash contributions. Twenty-five dollars, however, is too low a limit.

First of all, it is hard to imagine influencing any public official for the sum of $25. Section 5(C) prohibits giving an amount of cash to a candidate which is small enough that it could neither corrupt nor even give the appearance of corruption. The Intervening Defendants have not identified, nor has the Court found, any case where a federal court upheld a limitation on cash contributions as low as $25. This limitation is not narrowly tailored to address the evil which may be regulated.

Second, there are many people who do not have checking accounts, and there are others who wish to give modest contributions anonymously. A $25 cash contribution limitation infringes upon the First Amendment rights of these citizens of the community.

Once again, this Court does not purport to state what the lowest permissible limitation on cash contributions would be. It may only address the constitutionality of the limits that have been put into place by the electorate. And here, the limits at issue are so small that they run afoul of the Constitution by unnecessarily restricting protected political expression. Section 5(C) of the Charter Amendment is therefore unconstitutional.

## 3. *Subsection G(1)—Public disclosure of contributors home address regardless of the amount contributed:*

G. *DISCLOSURE*

(1) Home Address: All persons who make any financial contributions or loan to any campaign for municipal office shall be listed by home address on the candidate's Financial Report filed with the Summit County Board of Elections.

*Supplement to Complaint; Exhibit 1, Section 5(G)(1).*

■ The Federal Election Campaign Act (FECA) requires that political committees keep records of the names and addresses of those who make contributions in excess of $10, and requires the disclosure of the contributor's occupation and principal place of business if his contribution exceeded $100. The Supreme Court analyzed these disclosure requirements in a privacy context and voted to uphold such requirements, finding there "are govern-

**718**

mental interests sufficiently important to outweigh the possibility of infringement." *Buckley*, 424 U.S. at 66, 96 S.Ct. 612.[15]

As in *Buckley*, the Intervening Defendants allege similar interests and state that the purpose for requiring the listing of the contributor's home address (and employer) was "designed to help citizens understand who is potentially influencing local politicians and why they are trying to do so." *Intervening Defendants' Resp. (Doc. No. 58) at 6*. They further argue that the Ohio statute already requires such a disclosure, and that based upon the validity of O.R.C. § 3517.10, the city of Akron's Charter Amendment should likewise withstand a privacy challenge.

However, review of O.R.C. § 3517.10(B)(4)(b)(i) and Subdivision (F)(1), defining "Address," reveals that the Ohio statute does not require the disclosure of the *home* address of a contributor. The Ohio statute, in fact, allows the use of a *business or residence* address to satisfy the address disclosure requirement. The Akron's Charter Amendment makes no such distinction or allowance.

Plaintiffs maintain that the Intervenors have presented no evidence or argument rebutting the contention that the requirement to disclose a home address is materially chilling to political participation. *Plaintiffs' Reply at 20*. Nor have they presented either evidence or argument rebutting the contention that the objectives

of disclosing the geographic and business sources of contributions can be met without such intrusive requirements. *Id.* This Court agrees.

The City of Akron Charter Amendment goes beyond the permissible limitations recognized by *Buckley, supra*. Mandating the disclosure of home addresses as well as identities for all contributors, regardless of amount, is not a restriction sufficiently tailored to withstand constitutional scrutiny. A name and city of residence, or a business address, is sufficient to permit both attribution and verification. Many citizens have *unpublished* home addresses and telephone numbers for very important security reasons. To require the disclosure of such information would seriously impinge the First Amendment rights of anyone who may be reluctant, for security reasons, to reveal his or her home address.[16] The impact of this restriction is that these individuals would either lose their First Amendment right to make a political contribution in Akron, or would have to compromise their safety.

The Intervening Defendants fail to convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest. They have likewise failed to show a sufficient justification for such a limitation, or that the restriction is narrowly tailored. If there were a signifi-

---

**15.** The Supreme Court articulated three categories of governmental interests which it balanced against the contributor's right of privacy. First, disclosure provides the electorate with information as to where political campaign money comes from and alerts the voter to the interests to which a candidate is most likely to be responsive (and thus facilitate predictions of future performance in office). Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity. And third, recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of the contribution limitations. *Buckley* at 66–68, 96 S.Ct. 612.

**16.** In this regard, Plaintiffs make the distinction between disclosure of the contributor's home address to the public, versus disclosure of the home address *to the candidate*. Plaintiffs make it clear that they do *not* challenge the constitutionality of requiring that a contributor disclose a home address *to the candidate*. *Plaintiffs' Response (Doc. No. 67) at 21*. Plaintiffs recognize that disclosure of a residence address to the candidate is essential for purposes of the candidate's own record-keeping and audit, as well as for satisfying the requirement that a candidate disclose compiled information about the geographic sources of his/her contributions. Thus, Plaintiffs are only challenging the requirement that a contributor's home address be *publicly* disclosed and identified.

cant interest in public disclosure of what percentage a given candidate's contributions came from outside the City of Akron, for example, this could be accomplished by the requirement that each contributor list the *city* of residence, without having to disclose the actual street address.

Accordingly, Section 5(G)(1) cannot withstand constitutional scrutiny.

### 4. *Subsection G(2)—Identification of primary employer by any contributor of $50 or more:*

G. *DISCLOSURE*

(2) Employer Identification: The candidate for any municipal office shall identify all persons who contribute $50 or more by primary employer. If this information is not on file with the Summit County Board of Elections, the contribution shall be returned to the contributor within thirty (30) days after the filing of the candidate's Financial Report.[17]

*Supplement to Complaint; Exhibit 1, Section 5(G)(2).*

█ In support of this restriction, the Intervening Defendants state that "disclosure of the primary employer for those contributors of $50.00 or more is reasonable regulation designed to fulfill the purpose of reducing corruption in Akron poli-

tics." *Intervening Defendants' Resp. (Doc. No. 57) at 14.*

The Intervening Defendants again point to the existing Ohio statute that requires disclosure of a contributor's current employer (or occupation if the contributor is self employed) where the amount of the contribution exceeds $100.[18] In comparing Akron's Section 5(G)(2) with the provisions of Ohio Revised Code § 3517.10,[19] the Intervening Defendants state: "the State of Ohio already mandates employer disclosure of all contributors in excess of $100 for statewide office or seats in the General Assembly," and that Plaintiffs fail to offer any evidence "to distinguish how a $101.00 contribution lawfully triggers disclosure of employer but the same type of disclosure at $50.00 impairs constitutional rights." *Intervening Defendants' Resp. (Doc. No. 57) at 15–16.* "Our local ordinance, by requiring disclosure of employers at the $50.00 level and above, is not a difference in kind from that regulation especially given the size of Akron's municipal elections." *Intervening Defendants' Resp. (Doc. No. 58) at 12.* This Court agrees.

The Court cannot find a substantial difference in kind between Akron's employer disclosure requirement, triggered at the $50 level, and that of Ohio's, triggered at the $100 level. The amounts are too close for this Court to say that Akron's Charter Amendment Section 5(G)(2) cannot stand when the state statute has been in effect

---

17. Plaintiffs reiterate the fact that they do not challenge the public disclosure of the source of contributions compiled by employer and thus, to the disclosure of employer information by contributors to candidates, for record keeping and audit. *Plaintiffs' Reply at 22.*

18. O.R.C. § 3517.10(B)(4)(b)(ii) requires disclosure of the following in an itemized expenditure statement:

> If a campaign committee of a statewide candidate or candidate for the office of member of the general assembly receives a contribution from an individual that exceeds one hundred dollars, the name of the individual's current employer, if any, or, if the individual is self-employed, his occupation.

19. Other than *Lukens v. Brown*, 368 F.Supp. 1340 (S.D.Ohio1974); and *Lukens v. Brown*, 34 Ohio St.2d 257, 298 N.E.2d 132 (1973), there have been no other reported constitutional challenges to O.R.C. § 3517.10. In *Lukens* the plaintiff filed both in federal court, as well as in state court, challenging the constitutionality of § 3717.10's requirement that within 45 days of the election, candidates file a sworn statement covering campaign receipts and expenditures. Both the federal court and the Ohio Supreme Court ruled that the requirement withstands constitutional scrutiny. There are no reported cases in which the employer disclosure provision has been challenged.

for over twenty-five years.[20]

The Court also finds that the alleged intrusions upon the privacy rights of contributors as a result of this mandated disclosure are minimal, at best. Certainly, the public disclosure of one's employer is far less intrusive than the public disclosure of an individual's home residence. Plaintiffs have presented no case law to support the view that the Charter provision requiring employer disclosure is unconstitutionally burdensome.[21]

The Court therefore declines to strike down the City of Akron's Charter Amendment Section 5(G)(2) as an unconstitutional infringement on First Amendment rights. This provision therefore stands[22] and Plaintiffs' motion for summary judgment with respect to this provision is DENIED.

## IV. *INJUNCTIVE RELIEF*

The Supreme Court has taught that the abridgement of First Amendment freedoms constitutes irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *San Diego Committee v. Governing Bd.,* 790 F.2d 1471, 1473 n. 3 (9th Cir.1986); *see also Lydo Enterprises, Inc. v. City of Las Vegas,* 745 F.2d 1211, 1213 (9th Cir.1984) ("any loss of First Amendment rights, even briefly, can constitute irreparable injury"). Moreover, no adequate legal redress is available for such a violation.

Under these circumstances, and because the constitutional violations demonstrated by Plaintiffs are, by their nature, irreparable, and no adequate legal redress can compensate for the loss of political expression, issuance of a permanent injunction is mandated.

Therefore, the City of Akron, its officers, agents, servants, and employees are hereby PERMANENTLY ENJOINED from implementing, enforcing, or acting in reliance upon Subsections C, D, and G(1) of Section 5 of the Charter Amendment.

**IT IS SO ORDERED.**

## EXHIBIT A

Offered by_____Kilby

ORDINANCE NO. _____—1998 authorizing and directing the submission to the electors of the City of Akron of a proposal to supplement the Charter of the City of Akron by the addition of a new Section 5. "Campaign Finance Reform" to be voted upon at the next regular municipal election on November 3, 1998; and declaring an emergency.

WHEREAS, the Dollars and Democracy group have presented to Council a sufficient number of signatures to place a proposed Charter amendment on the ballot pursuant to Section 136 of the Charter of the City of Akron, Article XVIII §§ 8 and 9, Article XVII, § 1 of the Ohio Constitution, and Revised Code Title 35.

NOW, THEREFORE, BE IT ENACTED by the Council of the City of Akron:

*Section 1.* That Council hereby authorizes and directs the submission to the electors of The City of Akron at the next regular municipal election to be held at the usual places of voting in the City of Akron on November 3, 1998, between the hours of 6:30 a.m. and 7:30 p.m. Eastern Stan-

---

**20.** It is significant to note that the federal statute also has a low public disclosure threshold. Disclosure of employer information *is required for contributions over $200 in a calendar year.* 2 U.S.C. § 434(b)(3)(A) and 11 C.F.R. § 104.3(a)(4)(i).

**21.** See Plaintiffs' Reply at 22. "The balancing of these competing interests of privacy and disclosure is fundamentally a matter of judgment for the Court."

**22.** Section 5(H) of the Charter Amendment, entitled *SEVERABILITY,* provides that:

If any provision of the amendment, or the application of a provision to any person or circumstance, is held to be invalid, the remainder of this amendment, and the application of the provisions to any person or circumstance, shall not be affected by the holding.

dard Time of that day, of a proposal to amend the Charter of the City of Akron.

*Section 2.* That the ballots for the election referred to in Section 1, of this ordinance shall, at the top thereof, be entitled "City of Akron Proposed Charter Amendment", and the question to be submitted on those ballots shall be as follows:

*Charter Issue No.*—Shall the proposed amendment to the Charter of the City of Akron be adopted to add a new Section 5, which shall provide as follows:

*Section 5. CAMPAIGN FINANCE REFORM*

A. *PREAMBLE.* In order to demonstrate and promote ethics by government within the City of Akron: to further integrity in campaigns for public offices to prevent corruption and/or the appearance of corruption: and the restore and enhance the faith of the citizenry in government, we the people of this city do hereby establish this Amendment to the Charter of the City of Akron on Campaign Finance Reform.

B. *FUNDRAISING SEASON.* The fundraising season for the purpose of election or re-election to the office of Mayor or City Council shall commence on the 1st day of December prior to the General Election and end on the Thursday preceding the General Election. Campaign fundraising at other times is prohibited.

C. *LIMITS ON CASH CONTRIBUTIONS.* No candidate for Mayor or City Council shall accept, as a campaign contribution, more than $25 in cash (i.e. hard currency) from any person within any fundraising season. No person shall contribute cash in excess of said amount.

D. *LIMITS ON NONCASH MONETARY AND IN–KIND CONTRIBUTIONS AND LOANS.* No candidate for Mayor or At–Large Council shall accept or solicit, as a noncash monetary (i.e. checks, money orders, credit cars) or in-kind campaign contribution or loan,

more than $300 from any person, campaign committee, political party, or political action committee. No candidate for a Council Ward position shall accept or solicit, as a noncash monetary or in-kind campaign contribution or loan, more than $100 from any person, campaign committee, political party, or political action committee.

No person, political action committee, political party or political campaign shall contribute funds or in-kind contributions in excess of said amounts. Contributions from the candidate and labor of volunteers are exempt from these provisions.

E. *LIMITS ON NONRESIDENT CONTRIBUTION.* No candidate for Mayor or At–Large Council shall accept more than 25% of the total aggregate contribution accumulated during the fundraising season from natural persons who reside outside the City of Akron.

F. *SURPLUS CAMPAIGN FUNDS DEPOSIT.* Within sixty (60) days following a General Election a candidate for municipal office shall turn over any balance of campaign funds over expenses incurred at the time of and within 30 days after the election either to the General Fund for the City of Akron for the benefit of the citizenry or to one or more local charities recognized by the U.S. Internal Revenue Service as a 501(c)(3) organization.

G. *DISCLOSURE.*

(1) Home Address: All persons who make any financial contribution or loan to any campaign for municipal office shall be listed by home address on the candidate's Financial Report filed with the Summit County Board of Elections.

(2) Employer Identification: The candidate for any municipal office shall identify all persons who contribute $50 or more by primary employer. If this information is not on file with the Summit County Board of Elections, the contribution shall be returned to the contributor within thirty (30) days after the

filing of the candidate's Financial Report.

(3) Friday Report: All candidates for Mayor or City Council shall submit a Campaign Finance Report to the Clerk of City Council by noon on Friday prior to the Primary Election and General Election. This report shall identify all campaign contributions and expenditures made as of said Friday and this report shall be available for public viewing by the Clerk of City Council at the Akron Municipal Building within an hour after the filing deadline.

H. *SEVERABILITY.* If any provision of the amendment, or the application of a provision to any person or circumstance, is held to be invalid, the remainder of this amendment, and the application of the provisions to any person or circumstance, shall not be affected by the holding.

I. *PENALTIES.* Any violation of this Amendment is an offense to be reported to the Akron Police Department and is punishable as a misdemeanor of the first degree according to provisions specified in § 136.20 (Official Misconduct), Subsection (E), and § 136.21 (Soliciting or Receiving Improper Compensation), Subsections (D) and (E) of the Code of Ordinances of the City of Akron.

J. *ENABLING LEGISLATION.* City Council shall forthwith enact provisions necessary to enforce these Charter sections.

*Section 3.* That it is the desire and request of this Council that the ballot for the Charter amendment question referred to in Section 2, of this ordinance shall be substantially in the following form:

## PROPOSED CHARTER AMENDMENTS

### CITY OF AKRON

**A Majority Affirmative Vote Is**

**Necessary For Passage**

Shall the Charter of the City of Akron be supplemented by the addition of a new Section 5, which would regulate campaign finances in municipal office races by establishing a fundraising season, limiting cash contributions, limiting the amount of contributions, restricting contributions from nonresidents, mandating the forfeiture of unused campaign funds, requiring certain disclosures about contributors, penalizing violations of these restrictions, and empowering the City Council to enact provisions to enforce these restrictions?

YES

NO

*Section 4.* That the Clerk of Council is hereby directed to certify a copy of this ordinance to the Board of Elections of Summit County, Ohio, immediately upon the passage of this ordinance.

*Section 5.* That the Clerk of Council is hereby directed and authorized to have the full text of the above proposed Charter amendment published once a week for not less than two (2) consecutive weeks in a newspaper published and of general circulation in the City of Akron with the first publication being at least fifteen (15) days prior to the election at this amendment is to be submitted to the electors of the City.

*Section 6.* That this ordinance is hereby declared to be an emergency measure necessary for the immediate preservation of public peace, health, safety and welfare for the further reason that its immediate effectiveness is necessary to place this proposed amendment to the Charter on the November ballot, and provided this ordinance receives the affirmative vote of two-thirds of the members elected or appointed to Council, it shall take effect and be in force immediately upon its passage and approval by the Mayor, otherwise, it shall take effect and be in force at the earliest time allowed by law.

Passed_____ September 3 _____, 1998

/s/   Vincent Ciraco

/s/   John R. Otterman
President of Council
Pro Tem

Approved _____, 1998

_____

MAYOR

### JUDGMENT ENTRY

For the reasons set forth in the Memorandum of Opinion filed contemporaneously with this Judgment Entry, and pursuant to Rule 58 of the Federal Rules of Civil Procedure, IT IS HEREBY ORDERED, ADJUDGED and DECREED that the motion for summary judgment of Plaintiffs' (Document No. 36) is GRANTED in part.  Subsections C, D, and G(1) of Section 5 of the Charter to the City of Akron are unconstitutional, and the City of Akron is permanently enjoined from enforcing these provisions.  Subsection G(2) of Section 5 is not unconstitutional, and may be enforced.

It is further ORDERED, ADJUDGED and DECREED that judgment be entered in favor of Plaintiffs herein with respect to Subsections C, D, and G(1) of Section 5 of the Charter, and in favor of the Intervening Defendants with respect to Subsection G(2) of Section 5 of the Charter.  Accordingly, the above captioned action is hereby dismissed with prejudice.

**IT IS SO ORDERED.**